**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                 :

| | |
|---|---|
| : | C.A. No. 1:13-cv-00214-HB |
| : | |
| : | CLASS ACTION |
| In re: LONGWEI PETROLEUM : | |
| INVESTMENT HOLDING LIMITED : | JURY TRIAL DEMANDED |
| SECURITIES LITIGATION : | |
| : | |
| : | |
| : | |
| : | |
| : | |

-------------------------------------------------------X
This Document Relates To:  All Actions

RECEIVED
JUL 0 8 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................... 9

III.    THE PARTIES.................................................................................................... 10

        A.      Lead Plaintiffs........................................................................................10

        B.      Defendants ..............................................................................................10

        C.      Duties Of Individual Defendants ...........................................................13

        D.      Duties Of Audit Committee Defendants.................................................14

        E.      Duties Of Auditor Defendants ...............................................................16

IV.     BACKGROUND OF THE COMPANY ........................................................... 19

        A.      Longwei's Operating Facilities...............................................................20

                1.      The Taiyuan Facility ................................................................... 22

                2.      The Gujiao Facility ..................................................................... 22

                3.      The Huajie Facility ..................................................................... 23

        B.      Longwei's Financing Activities...............................................................24

V.      CLASS PERIOD EVENTS AND FALSE AND MISLEADING STATEMENTS......... 30

VI.     THE TRUTH IS REVEALED............................................................................. 53

        A.      Nonexistent Fuel Sales............................................................................53

        B.      Undisclosed Investments And Related Party Transactions .....................63

VII.    POST CLASS PERIOD EVENTS....................................................................... 65

VIII.   DEFENDANTS' GAAP, GAAS, AND INTERNAL CONTROLS VIOLATIONS ....... 66

        A.      Defendants' GAAP Violations .................................................................66

                1.      Overstatement Of Revenues ....................................................... 68

                2.      Undisclosed Investments And Related Party Transactions ....................... 70

        B.      Defendants' GAAS Violations .................................................................76

|  |  | C. | Defendants' Internal Control Violations And Misrepresentations | 80 |
| IX. | ADDITIONAL SCIENTER ALLEGATIONS | | | 84 |
|  | A. | All Defendants | | 84 |
|  | B. | Officer Defendants | | 88 |
|  | C. | Audit Committee Defendants | | 90 |
|  | D. | Auditor Defendants | | 92 |
|  | E. | Red Flags | | 96 |
| X. | CLASS ACTION ALLEGATIONS | | | 98 |
| XI. | GROUP PLEADING | | | 100 |
| XII. | LOSS CAUSATION | | | 101 |
| XIII. | CONTROL PERSON LIABILITY | | | 102 |
| XIV. | FRAUD-ON-THE-MARKET PRESUMPTION | | | 103 |
| XV. | THE AFFILIATED UTE PRESUMPTION | | | 104 |
| XVI. | NO STATUTORY SAFE HARBOR | | | 105 |
| XVII. | CAUSES OF ACTION | | | 107 |
|  | COUNT I | | | 107 |
|  | COUNT II | | | 109 |
| XVIII. | PRAYER FOR RELIEF | | | 111 |
| XIX. | JURY TRIAL DEMANDED | | | 112 |

Lead Plaintiffs Paul Love, Fabio Benedetto Lupis, and Chris Wilson (collectively, "Lead Plaintiffs" or "Plaintiffs") allege the following, individually and on behalf of all Class Members, as defined herein, based upon personal knowledge as to Lead Plaintiffs' own acts and based upon information and belief as to other acts. Lead Plaintiffs' information and belief is based upon the investigation by Lead Plaintiffs' counsel into the facts and circumstances alleged herein, including, without limitation: (i) review and analysis of public filings by Longwei Petroleum Investment Holding Limited ("Longwei" or the "Company") with the United States Securities and Exchange Commission ("SEC") and Chinese regulatory authorities such as the State Administration of Taxation (the "SAT") and State Administration for Industry and Commerce ("SAIC"); (ii) review and analysis of press releases, analyst reports, public statements, news articles, and other publications disseminated by or concerning Longwei and the other defendants named herein (together with Longwei, the "Defendants"); (iii) review and analysis of the Company's conference calls, press conferences, corporate website, and related statements and materials; (iv) independent interviews with local residents conducted by investigators on behalf of Plaintiffs ("Plaintiffs' Investigators"); and (v) a consultant regarding the auditing of publicly traded companies. Many additional facts supporting the allegations herein are known only to the Defendants and/or are within their exclusive custody or control. Plaintiffs believe that additional evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery.

## I.      NATURE OF THE ACTION

1.      This is a federal class action on behalf of investors who purchased or otherwise acquired Longwei securities between September 28, 2010 and January 3, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.      With China's recent rise in economic prominence, private Chinese operating companies have utilized Chinese reverse mergers ("CRMs") to gain access to U.S. capital markets without the scrutiny of their financial records required by either a U.S. or Chinese initial public offering.  In a CRM, a public U.S. reporting company with few or no operations, *i.e.*, a shell, or as in this instance a blank check company, acquires a private Chinese operating company with a viable business.  Typically, the shareholders of the private Chinese operating company exchange their shares for a large majority of the shares of the public U.S. company. Although the public U.S. blank check company survives the merger, the private Chinese operating company's shareholders gain a controlling interest in the voting power and outstanding shares of stock of the publicly-traded shell company.  Moreover, by using a CRM, the shareholders of the Chinese operating company are not subject to many of the restrictions on selling their shares that would accompany an IPO.  However, the assets and business operations of the post-merger surviving public company are primarily, if not solely, those of the former private Chinese operating company.

3.      Longwei began operations in July 1995 in the People's Republic of China ("PRC") as Longwei Petroleum Investment Holding Limited, a BVI Corporation ("Longwei BVI").  The Company engaged in the wholesale distribution of finished petroleum products throughout the PRC, initially operating one petroleum storage facility referred to as the "Taiyuan Facility."  In October 2007, Defendants Cai Yongjun ("Cai") and Xue Yongping ("Xue"), as the sole shareholders of Longwei BVI, completed a CRM acquisition of Tabatha II, Inc. ("Tabatha II"), and changed its name to Longwei Petroleum Investment Holding Limited, granting the Company access to the lucrative U.S. stock registration.  At the time of the reverse

merger, Cai and Xue, as the only directors of Longwei, chose to retain Defendant Child

VanWagoner & Brashaw, PLLC as the Company's auditor.

      4.      Prior to the start of the Class Period, Defendants raised tens of millions of dollars

through the private placement of various securities, including unregistered shares of common

stock, convertible preferred stock, and/or warrants to purchase Longwei common stock.

Notably, Defendants also paid promotional, professional, and consulting fees by issuing

millions of additional shares of stock.  For example, on April 9, 2009, Longwei entered into an

agreement whereby it agreed that upon certain contingent events which the Company

subsequently deemed met, the Company would issue 1.9 million shares of common stock to

RedChip Companies, Inc. ("RedChip") for marketing and investor relations services to be

provided over just a six-month period.

      5.      Then, on October 29, 2009, Longwei conducted a private placement of

13,499,274 units, with each unit consisting of:  (i) one share of preferred stock, convertible to

common stock at $1.10 per share; and (ii) a warrant to purchase one share of Longwei common

stock at $2.255 per share (the "October 2009 Financing").  In order to convince qualified

investors to purchase the units, Defendants Cai and Xue had to issue a guarantee that the

Company would report net income before taxes of $23.9 million for 2010.[1]  To support this

guarantee, Cai and Xue were required to deposit 13,499,274 shares of their personal holdings of

Longwei common stock in escrow pursuant to a "Make Good Escrow Agreement."  With the

guarantee in place, Longwei was able to sell all of the units and raised over $12 million in net

proceeds from the October 2009 Financing.

---

[1]     Longwei's fiscal year ends June 30.  Therefore the guarantee related to the period from
July 1, 2009 through June 30, 2010.

6.     Nevertheless, at the beginning of the Class Period, Cai and Xue had nearly 14 million shares of their personal holdings at risk if the Company could not report $23.9 million in after-tax net income during the 2010 fiscal year, which would be the highest net income ever reported by Longwei.  Moreover, Defendants knew that if Longwei could not drive the Company's stock price above the $2.255 per share strike price during the three-year exercisable term, the Company would not reap the additional $32 million it could potentially receive from the exercise of the warrants from the October 2009 Financing, and the Company would no longer be able to obtain legal, promotional, and consulting services through the issuance of warrants, as it had done in the past.  Thus, the Company, Cai and Xue were keenly motivated to report record revenues and maintain an inflated stock price.

7.     Following its acquisition of Tabatha II in 2007, Longwei's stock began trading on the Over-the-Counter Bulletin Board ("OTC Bulletin Board").  To truly capitalize on its access to the U.S. capital market, Defendants sought to upgrade its stock listing from the OTC Bulletin Board to the New York Stock Exchange ("NYSE"), where the market's greater liquidity would facilitate increased stock sales by warrant holders.  To accomplish this listing, Defendants Cai and Xue, as the only directors of the Company, appointed three hand-picked, yet purportedly "independent", directors to serve as the only members of the Longwei Board of Directors' Audit Committee to satisfy NYSE listing requirements.  The purportedly independent directors, however, had longstanding ties to the Company's promoters, auditors, and/or advisors, such as RedChip, and served as little more than a rubber stamp for Cai and Xue throughout the Class Period.  Also prior to the Class Period, Longwei added a second petroleum storage facility referred to as the "Gujiao Facility", which at the time of its acquisition was a "dormant operating entity."

4

8.     Thus, at the start of the Class Period, Longwei had two facilities in China that it claimed were operational and generating revenues for the Company from the sale of petroleum products: its headquarters near Taiyuan City (the "Taiyuan Facility") and the newly-acquired branch near Gujiao City (the "Gujiao Facility"). Even though Longwei operated in a highly-regulated industry that was subject to wild fluctuations in the price of oil, throughout the Class Period, Longwei stated that the growing demand for petroleum products in China enabled the Company to report quarter after quarter of purportedly "record results." These record results allowed the Company to report net income attributable to common shareholders of $41,094,191 for fiscal year 2010, and the shares held in the Make Good Escrow Account were returned to Defendants Cai and Xue. In achieving these results, Longwei reported $74 million in sales from the previously dormant Gujiao Facility.

9.     Despite numerous red flags, as discussed below, Longwei's auditors, who had a long history of performing deficient audits on the financial results for CRM companies, repeatedly issued unqualified audit opinions for the Company's record financial results reported throughout the Class Period. Likewise, the Audit Committee Defendants (as defined herein) repeatedly approved the inclusion of these record financial results in the Company's SEC filings, *even though the Board of Directors never held a single Board meeting during the Class Period.* These positive results drove up the trading price of Longwei stock during the Class Period, facilitating increased stock sale by warrant holders. This, in turn, enabled Longwei to purchase a third operating facility during the Class Period, the assets of Huajie Petroleum Co., Ltd. (the "Huajie Facility"). Once again, Longwei reported heavy instant sales from this previously non-operational facility.

10.     On January 3, 2013, during the trading day, the research analyst firm

*GeoInvesting.com* published a report entitled "Longwei Petroleum: The Most Brazen China-

Based U.S. Listed RTO To Date" (the "*GeoInvesting* Report"), a copy of which is annexed

hereto as Exhibit A.  Among other things, the *GeoInvesting* Report details the massively

overstated business operations at the Company's three fuel storage facilities within Shanxi:

Taiyuan, Gujiao, and the later-acquired Huajie Facilities based upon 24-hour, seven-day-a-week

time-lapse video surveillance.  This report has been confirmed by interviews with local

residents, Chinese state news media, and video and still photography, all of which uniformly

demonstrate that the Taiyuan Facility has been nearly idle for years, and that since the change of

ownership, both the Gujiao and Huajie Facilities remain dormant and their tanks stand empty.

In fact, the state-run China Central Television ("CCTV") has broadcast footage showing that the

railroad spurs, which supposedly supplied the Taiyuan and Gujiao Facilities with petroleum

products during the Class Period, are rusted, overgrown with weeds, and virtually impassable.

11.     The *GeoInvesting* Report summarized Longwei's fraudulent business practices,

in pertinent part, as follows:

> Longwei is reportedly engaged in the wholesale distribution of finished petroleum
> products in the People's Republic of China (the "PRC").  LPH's headquarters are
> located in Taiyuan, Shanxi Province, adjacent to and overlooking its Taiyuan fuel
> storage facility.  LPH has a reported fuel storage capacity of 220,000 metric tons
> located at three storage facilities within Shanxi: Taiyuan, Gujiao and Huajie,
> which it claims have individual storage capacities of approximately 50,000 metric
> tons ("mt"), 70,000mt, and 100,000mt, respectively.
>
> Unfortunately for owners of LPH stock, we have determined that the company's
> purported business operations are massively overstated and a brazen fraud, on an
> order of magnitude unmatched before by any China-based companies we have
> seen.  Furthermore, we have no faith in LPH's auditor, Anderson Bradshaw.  This
> is because the firm's head of quality control, Russell Anderson, was the audit
> partner of YUII while he worked at Child, Van, Wagoner & Bradshaw.  Russell
> failed to detect the massive YUII fraud we uncovered and did not resign until the
> YUII Chairman admitted fraud 5 days after we exposed them.  Our expose led to

6

YUII's delisting. LPH stock in our opinion is virtually worthless, completely un-investable and should be immediately delisted by the New York Stock Exchange ("NYSE"). We are sending all of our evidence to the NYSE and other securities regulators, just as we have done in prior cases.

**Contents**

**Part I – Wholesale Fuel Sales Are Virtually Nonexistent**

1. 1.7 weeks (October 26 to December 13,2012) of 24/7 time-lapse video surveillance of LPH's Taiyuan and Gujiao fuel storage depots detected only 5 tanker trucks fueling at the two facilities, combined.

2. In recent press releases and 8-K filings, LPH exaggerated its main Taiyuan and Gujiao facilities' November 2012 sales by a factor of over 800 times.

3. In October 2012, prior to conducting our video surveillance, we discovered that the railroad spurs to the Taiyuan and Gujiao facilities were covered with vegetation and appeared unused in quite some time.

4. Locals that we interviewed said that LPH's business had been bad for a long time. We were told that the Gujiao facility had been almost completely idled since 2011, when it began losing money on fuel it sold due to unstable fuel prices since 2011.

5. From December 9 to 22, 2012, we conducted 13 days of 24/7 time-lapse video surveillance of the newly-opened Huajie fuel storage depot and detected zero tanker trucks being fueled at the facility.

6. CFO Mike Toups, by simply looking out of the Taiyuan office windows at the nearly idled tanker fueling station next door should have easily detected and prevented LPH's brazen fraud given the amount of time he claims to spend at the facility.

**Part II – Legal Issues Abound**

1. LPH never disclosed an investment of $32 million (out of a total commitment of $222 million) in a Tourism business made by its subsidiary Shanxi Zhonghe Energy Conversion Co., Ltd. ("Zhonghe").

12. That same day, the research division of RedChip, the Company's paid investor relations firm that purported to provide independent research analysis ("RedChip Research"), announced its suspension of all research coverage on Longwei. RedChip Research also

7

suspended the investment rating and price target on Longwei until further notice and announced

that the previous investment rating and price target on Longwei were no longer in effect and

should not be relied upon.  Finally, RedChip announced that it was terminating its contract with

Longwei.

13.     Following the publication of the *GeoInvesting* Report and the suspension of

RedChip Research's endorsement, shares of Longwei stock plummeted $1.66, or 72% in a

single day, to a closing price on January 3, 2013 of $0.62 per share, on massive trading volume

of more than 14.5 million shares traded, more than twenty six times the average daily trading

volume over the preceding thirty trading days.

14.     As a result of Longwei's fraud, exposed by the *GeoInvesting* Report, the price of

Longwei securities traded at artificially inflated prices during the Class Period, allowed

Defendants Cai and Xue to each sell 1 million shares of their personal holdings at inflated

prices, secured the release of nearly 14 million shares of Cai and Xue's Longwei stock from the

Make Good Escrow Agreement, and enabled certain early qualified investors and others,

including Longwei consultants, to cash out at significant profits.  The Company also raised

millions of dollars when purchasers of the warrants issued during the October 2009 Financing

exercised their rights to purchase common stock.  However, once the true facts regarding

Longwei became known to the market, the Company's shares were hammered by massive sales,

sending them down more than 80% from their Class Period high, and more than $169 million in

market capitalization vanished.

15.     Then, in the wake of the *GeoInvesting* Report, two of the three members of the

Audit Committee resigned, one noting that the Company's full board of directors (the "Board")

refused to approve the Audit Committees' resolution to commence an independent investigation

into the *GeoInvesting* Report.   Shortly thereafter, the Company's stock was delisted by the

NYSE and Longwei's longtime auditor resigned, citing "a limitation on the scope of its work

imposed by the Company."

16.     Lead Plaintiffs hereby bring claims against each of the Defendants named in this

action for the losses caused by their respective misconduct.

## II.     JURISDICTION AND VENUE

17.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, as

amended, 15 U.S.C. §§ 78j(b) and 78(t), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5,

promulgated thereunder.

18.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and

Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27

of the Exchange Act, 15 U.S.C. § 78aa, as a substantial part of the transactions, events, and

omissions giving rise to the claims occurred in the United States and New York.  During the

Class Period, the Company's stock was listed on the NYSE, which is based in New York.

Longwei's legal counsel, Sichenzia Ross Friedman Ference LLP, which helped the Company

with its SEC filings and public statements, is headquartered in New York.  One of the

Company's two investor relations firms, the Weitian Group LLC, has its U.S. office in New

York.  The Company participated in various investor conferences in New York during the Class

Period, including the Rodman & Renshaw Annual Global Investment Conference on September

11-13, 2011; the RedChip Small-Cap New York Conference on November 9, 2011; and the

RedChip Small-Cap New York Conference on April 26, 2012.  Moreover, the Court has

jurisdiction over the Defendants named herein because each Individual Defendant has sufficient

contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    THE PARTIES

### A.    Lead Plaintiffs

21.    Plaintiff Paul Love, as set forth in his shareholder certification and incorporated by reference herein (Dkt. No. 20-2), purchased LPH securities at artificially inflated prices during the Class Period and has been damaged thereby.

22.    Plaintiff Fabio Benedetto Lupis, as set forth in his shareholder certification and incorporated by reference herein (Dkt. No. 20-2), purchased LPH securities at artificially inflated prices during the Class Period and has been damaged thereby.

23.    Plaintiff Chris Wilson, as set forth in his shareholder certification and incorporated by reference herein (Dkt. No. 20-2), purchased LPH securities at artificially inflated prices during the Class Period and has been damaged thereby.

### B.    Defendants

24.    Defendant Longwei is a Colorado corporation with a principal place of business in Shanxi Province, China.  Longwei promotes itself as "an energy company engaged in the wholesale distribution of finished petroleum products in the PRC."  During the Class Period, Longwei's stock was traded on the NYSE AMEX.

25.    Defendant Cai was a founder of Longwei, and at all times relevant to this Complaint, was Longwei's Chief Executive Officer ("CEO") and chairman of the Longwei

10

Board.  According to Longwei's Proxy Statement Pursuant to Section 14(a) of the Exchange Act filed with the SEC on November 27, 2012, Cai holds 33,500,000 shares of Longwei common stock, or 33% of the outstanding shares of the Company.

26.     Defendant Michael Toups ("Toups") has been the Chief Financial Officer ("CFO") at Longwei since his appointment on June 23, 2010.  Simultaneously, Toups served as CFO for China Bilingual Education Group, Inc. ("China Bilingual") from June 2010 until his resignation on April 1, 2013, shortly before China Bilingual terminated its registration with the SEC on April 15, 2013.  Toups also served as CFO of Worldwide Energy Management, Inc. ("WEM"), from the time Defendant Gerald DeCiccio resigned from the position effective February 19, 2011 until the registration of WEM's securities was revoked by the SEC on May 16, 2012.

27.     Defendant Xue at all relevant times to this Complaint was a director, secretary, and treasurer of the Company.  According to Longwei's Proxy Statement Pursuant to Section 14(a) of the Exchange Act filed with the SEC on November 27, 2012, Xue holds 33,500,000 shares of Longwei common stock, or 33% of the outstanding shares of the Company.

28.     Defendants Cai, Toups, and Xue are referred to herein as the "Officer Defendants."

29.     Defendant Gerald DeCiccio ("DeCiccio") was a director of the Company, and a member of the Longwei Board's Compensation, Nominating, and Audit Committees from his appointment on March 22, 2010 until he declined to stand for reelection to the Board on December 15, 2011 at the Company's first Annual Meeting of Shareholders.  DeCiccio further served as the chair of and financial expert for the Board's Audit Committee.  DeCiccio served as the CFO of GTC Telecom Corp. ("GTC") from January 1999 to May 30, 2007 and also

served as its principal accounting officer, a period in which GTC was forced to restate its
financial results twice as detailed below. DeCiccio was also a director and member of the audit
committee of WEM from June 1, 2009 until February 18, 2010, when he was named CFO of
WEM, a position which he held until his resignation on February 19, 2011, shortly before the
registration of WEM's stock was revoked by the SEC.

30.     Defendant Douglas Cole ("Cole") was a director of the Company and a member
of the Longwei Board's Compensation, Nominating, and Audit Committees from his
appointment on March 22, 2010 until his resignation on January 28, 2013. On or about October
31, 2012, Cole was appointed as managing director of RedChip – Longwei's investor relations
firm – to oversee operations at its new San Francisco office. From September 2010 to
November 2011, Cole served as a member of the board of directors of China Chemical Corp., a
company which had retained RedChip to serve as its investor relations consultant.

31.     Defendant Dora Dong ("Dong") has been a director of the Company and a
member of the Longwei Board's Compensation, Nominating, and Audit Committees since
December 15, 2011. Dong also served as a director and member of the audit committee of
WEM from July 2010 to June 2011, and as a director and member of the audit committee of
China Bilingual, since January 2011. Dong also served at relevant times as vice president,
Asian Pacific, for RedChip.

32.     Defendants DeCiccio, Cole, and Dong are collectively referred to herein as the
"Audit Committee" or the "Audit Committee Defendants."

33.     The Officer Defendants and the Audit Committee Defendants are collectively
referred to herein as the "Individual Defendants."

34.    Defendant Child VanWagoner & Bradshaw, PLLC ("CvWB") at all relevant times was a certified public accountant firm and served as the principal accountant and auditor for Tabatha II and Longwei until CvWB changed its accounting practice and name on or about August 1, 2012 to Anderson Bradshaw, PLLC.  Prior to the Class Period, CvWB was formerly known as Child, Sullivan & Company.

35.    Defendant Anderson Bradshaw, PLLC ("Anderson Bradshaw"), is a certified public accountant firm and is the successor in interest to Defendant CvWB.  As the successor in interest to CvWB, Anderson & Bradshaw served as the principal accountant and auditor for Longwei beginning on August 1, 2012 until its resignation on May 30, 2013.

36.    Defendants CvWB and Anderson Bradshaw are collectively referred to herein as the "Auditor Defendants."

37.    Defendant Russell Anderson ("Anderson") at all relevant times was a member of CvWB and Anderson & Bradshaw, and was the principal audit partner and contact person for all Longwei audits since no later than February 15, 2011.

**C.    Duties Of Individual Defendants**

38.    The Individual Defendants, because of their positions with the Company, had the authority to control, correct, and update the contents of Longwei's public disclosures to the market.  Each of the Individual Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts relating to the financial reporting and results of operations of Longwei.  To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning the business, operations, and financial reporting of Longwei.  By virtue of such duties, these officers and directors were required, *inter alia*, to:

a.    conduct and supervise the business of Longwei in accordance with federal

13

laws;

b.      supervise the preparation of the Company's SEC filings and to approve
any reports concerning the financial reporting and results of Longwei; and

c.      ensure that Longwei established and followed adequate internal controls.

39.     As officers, directors, and/or controlling persons of a publicly-held company

which is registered with the SEC under the federal securities laws and the securities of which

are traded on the NYSE and governed by the provisions of the federal securities laws, the

Individual Defendants each had a duty to:  (i) promptly disseminate accurate and truthful

information with respect to Longwei's financial condition and performance, growth, operations,

financial statements, business, products, markets, management, earnings, and present and future

business prospects; (ii) correct any previously-issued statements that had become materially

misleading or untrue so that the market could accurately price the Company's publicly-traded

securities based upon truthful, accurate, and complete information; and (iii) update any

previously-issued statements that had become materially misleading or untrue so that the market

could accurately price the Company's publicly traded securities based upon truthful, accurate,

and complete information.

40.     The Individual Defendants are each primarily liable for the misrepresentations

and misleading statements alleged and are also liable as controlling persons of Longwei.  The

scheme deceived the investing public regarding Longwei's financial and operational condition

and caused Lead Plaintiffs and other members of the Class to purchase Longwei securities at

artificially inflated prices during the Class Period and suffer damages as a result.

**D.      Duties Of Audit Committee Defendants**

41.     During the Class Period, the Audit Committee consisted of Defendants

DeCiccio, Cole, Dong, and non-defendant Xue Xiaoping ("Xiaoping").  The Proxy Statements

for the annual meetings of shareholders during the Class Period state that the purpose of the

Audit Committee is to assist the Board in monitoring:

     a.     accounting, auditing, and financial reporting processes;

     b.     the integrity of its financial statements;

     c.     internal controls and procedures designed to promote its compliance with accounting standards and applicable laws and regulations; and

     d.     the appointment and evaluation of the qualifications and independence of its independent auditors.

     42.     According to Longwei's Audit Committee Charter, "[t]he primary function of the Audit Committee (the "Committee") is to oversee the accounting and financial reporting processes of Longwei Petroleum Investment Holding Ltd. and its subsidiaries (the "Corporation"), and the audits of the financial statements of the Corporation."

     43.     To fulfill this purpose, the Audit Committee Charter provides that the Committee has the following specific duties:

     1.     Review with representatives of management and representatives of the independent accounting firm the Corporation's audited annual financial statements prior to their filing as part of the Annual Report on Form 10-K. After such review and discussion, the Committee shall recommend to the Board of Directors whether such audited financial statements should be published in the Corporation's Annual Report on Form 10-K. The Committee shall also review the Corporation's quarterly financial statements prior to their inclusion in the Corporation's Quarterly Reports on Form 10-Q.

     *          *          *

     4.     The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any independent accounting firm engaged by the Corporation for the purpose of preparing or issuing an audit report or performing other audit, review or attest services or any other related work.

     5.     The authority of the Committee shall include ultimate authority to approve all audit engagement fees and terms. The Committee shall have the ultimate authority and responsibility to appoint, evaluate and, when warranted, replace,

such independent accounting firm (or to recommend such replacement for shareholder approval in any proxy statement).

*          *          *

16.     In consultation with the independent accounting firm and management, review annually the adequacy of the Corporation's internal control over financial reporting.

17.     Review disclosures made to the Committee by the Corporation's chief executive officer and chief financial officer in connection with their certifications of the Corporation's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, including disclosures concerning (a) evaluations of the design and operation of the Corporation's internal control over financial reporting, (b) significant deficiencies and material weaknesses in the design and operation of the Corporation's internal control over financial reporting which are reasonably likely to adversely affect the Corporation's ability to record, process, summarize, and report financial information, and (c) any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal controls. The Committee shall direct the actions to be taken and/or make recommendations to the Board of Directors of actions to be taken to the extent such disclosures indicate the finding of any significant deficiencies in internal controls or fraud.

*          *          *

19.     Request and review periodic reports from management of the Corporation as to the Corporation's processes for reporting on internal controls of the Corporation as required by Section 404 of the Sarbanes-Oxley Act of 2002. . . .

44.     The Audit Committee Defendants were further responsible for enforcement of the Company's Code of Ethics, which specifically provides:

**BE TIMELY AND ACCURATE IN ALL PUBLIC REPORTS**

As a public company, we must be fair and accurate in all reports filed with the United States Securities and Exchange Commission. Our officers, directors and management are responsible for ensuring that all reports are filed in a timely manner and that they fairly present the financial condition and operating results of the Company.

**E.     Duties Of Auditor Defendants**

45.     The Auditor Defendants' responsibilities are to (1) plan and perform an audit to obtain reasonable assurance about whether such financial statements are free of material

16

misstatement, whether caused by error or fraud,[2] and (2) express an opinion on "the fairness

with which [such financial statements] present, in all material respects, financial position,

results of operations, and its cash flows in conformity with [GAAP]." (AU 110,

*Responsibilities and Functions of the Independent Auditor* ("AU 110") .01-.02).

46.     Additionally, the auditor must, when performing audit procedures on a subject

company, adhere to a complete set of applicable professional standards, as established by the

American Institute of Certified Public Accountants ("AICPA") in the form of Generally

Accepted Auditing Standards ("GAAS"), and adopted and supplemented by the Public

Company Accounting Oversight Board ("PCAOB"), which was established by Congress, by

way of the Sarbanes-Oxley Act of 2002, to oversee the audits of public companies in order to

protect the interests of investors and further the public interest in the preparation of informative,

accurate, and independent audit reports.

47.     The auditor's report is the medium through which an auditor expresses an

opinion.  (AU 110.01).  There are several types of audit opinions that may be issued by an

auditor, as described in AU 508, *Reports on Audited Financial Statements* ("AU 508"),

including the following:

- *Unqualified opinion.* An unqualified opinion states that the financial
  statements present fairly, in all material respects, the financial position,
  results of operations, and cash flows of the entity in conformity with
  generally accepted accounting principles. This is the opinion expressed in
  the standard report...[3]

- *Explanatory language added to the auditor's standard report.* Certain

---

[2]     AU 316 states that fraud is a broad legal concept, so an auditor's interest specifically
relates to acts that result in a material misstatement of the financial statements.  (AU 316.03 for
fiscal 2003; AU 316.05 for fiscal 2004 and 2005).

[3]     Such an opinion should be based on the auditor's judgment as to whether, amongst other
things, "...the financial statements, including the related notes, are informative of matters that
may affect their use, understanding, and interpretation..." (AU 411.04).

circumstances, while not affecting the auditor's unqualified opinion on the
financial statements, may require that the auditor add an explanatory
paragraph (or other explanatory language) to his or her report.[4]

- *Qualified opinion.* A qualified opinion states that, except for the effects of
  the matter(s) to which the qualification relates, the financial statements
  present fairly, in all material respects, the financial position, results of
  operations, and cash flows of the entity in conformity with generally
  accepted accounting principles.[5]

- *Adverse opinion.* An adverse opinion states that the financial statements
  do not present fairly the financial position, results of operations, or cash
  flows of the entity in conformity with generally accepted accounting
  principles.[6]

- *Disclaimer of opinion.* A disclaimer of opinion states that the auditor does
  not express an opinion on the financial statements.[7]  (AU 508.10)

(Emphasis in original) (Footnotes added).

48.     An auditor may only express an unqualified (or "clean") audit opinion when the

auditor has formed such an opinion on the basis of an audit performed in accordance with

GAAS.  (AU 508.07).  Accordingly, when an auditor has failed to conduct its audit in

accordance with GAAS, or is aware or should have been aware of material misstatements in a

---

[4]     Such circumstances include, but are not limited to:  (1) the existence of substantial doubt
about the entity's ability to continue as a going concern, and (2) emphasizing a particular
matter, such as "[t]hat the entity has had significant transactions with related parties."  (AU
508.11, .19).

[5]     A qualified opinion is expressed when (1) "[t]here is a lack of sufficient appropriate
audit evidence or there are restrictions on the scope of the audit that have led the auditor to
conclude that he or she cannot express an unqualified opinion and he or she has concluded not
to disclaim an opinion…," and (2) "[t]he auditor believes, on the basis of his or her audit, that
the financial statements contain a departure from generally accepted accounting principles, the
effect of which is material, and he or she has concluded not to express an adverse opinion…"
(AU 508.20).

[6]     Either a qualified or an adverse opinion should be expressed when the financial
statements contain inadequate disclosure, in violation of GAAP.  (AU 508.41).

[7]     A disclaimer is appropriate when an auditor is unable to form or has not formed an
opinion as to the fairness of presentation of the financial statements in conformity with GAAP,
particularly when the auditor has not performed an audit sufficient in scope to enable him or her
to form such an opinion.  (AU 508.61 - .62).

subject company's financial statements, whether by error or fraud, it is limited to only expressing a qualified or adverse opinion, disclaiming its opinion, or issuing no opinion at all.

49.    An unqualified opinion provides assurance to users of an entity's financial statements that such financial statements are fairly stated, in all material respects, in accordance with GAAP.[8]

50.    The issuance of an unqualified opinion in the absence of a complete or fully-GAAS audit, therefore, not only violates the auditor's obligations under those same standards but does a severe disservice to the subject company, its investors, and the investing public in the case of a public company such as Longwei.

### IV.    BACKGROUND OF THE COMPANY

51.    Longwei began operations in July 1995 in the PRC as Longwei BVI, a British Virgin Islands corporation.  Separately, Tabatha II, a blank check development-stage company, was incorporated by promoters under the laws of the State of Colorado in March 2000.  In 2005, Tabatha II's promoters retained Child, Sullivan & Company (the predecessor to the Auditor Defendants named herein) as Tabatha II's auditors.  In October 2007, Defendants Cai and Xue, as the sole shareholders of Longwei BVI, completed a CRM acquisition of Tabatha II, and changed its name to Longwei Petroleum Investment Holding Limited, granting the Company access to a lucrative U.S. stock registration.

52.    Following its acquisition of Tabatha II in 2007, Longwei's stock began trading on the OTC Bulletin Board.  To truly capitalize on its access to the U.S. capital market,

---

[8]    This concept is supported by, and expressed in, GAAS Standards of Reporting (defined below), which state that (1) "[i]nformative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report[,]" and "[t]he report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period."  [AU 150, *Generally Accepted Auditing Standards* ("AU 150"), .02].

Defendants sought to upgrade its stock listing from the OTC Bulletin Board to the NYSE, where the more liquid trading market would facilitate increased stock sales by warrant holders and other securities holders.  To satisfy NYSE listing requirements, Defendants Cai and Xue hand-picked three "independent" directors to serve on the Longwei Board of Directors Audit Committee.  The purportedly independent directors, however, had longstanding ties to the Company's promoters, auditors, and advisors, such as RedChip, which served the dual role of investor relations consultant and research analyst issuing research reports on Longwei stock during the Class Period.

A.    **Longwei's Operating Facilities**

53.    Longwei promotes itself as an energy company engaged in the wholesale distribution of finished petroleum products in the PRC.  The Company's oil and gas operations consist of transporting, storing, and selling finished petroleum products, entirely in the PRC.  The Company purchases diesel, gasoline, fuel oil, and solvents (the "Products") from various petroleum refineries in the PRC and throughout the world.  The Company also states that it markets its Products to commercial, industrial, retail, and wholesale customers, including transportation companies, coal mining operators, power suppliers, large-scale gas stations, and small and independent gas stations.

54.    The wholesale petroleum industry in the PRC is highly regulated.  Notably, all petroleum wholesalers are subject to the same price regulations, both in the purchase and sale of petroleum products.  As explained by Defendant Toups in a conference call on February 15, 2011, with respect to the purchase price of Longwei's Products:

> With the regulatory agencies within China, it's regulated on basis of a 22 day, business day, moving average based on a basket of international prices.  So what the government will do is they'll look on a look-back basis what has been the movement in the international markets.  And if it's plus or minus 4%, they'll adjust prices accordingly. . .

*  *  *

On the sell side, we're regulated in terms of the wholesale price. So that's...
again that's set by the government in terms of what the wholesale price is. And
again there's some flexibility, plus or minus 1-2% on that based on incentives and
other things we can offer to customers.

55. The Company's operations are primarily located in the Shanxi Province, which is
mountainous and has no oil reserves, pipelines, or refineries. Petroleum products must be
brought in from outside of the province via rail or truck, either from refineries in the
neighboring provinces or from the numerous refineries in the coastal provinces of the northeast
PRC. Consequently, it requires wholesale distributors to maintain operational facilities for rail
and truck deliveries.

56. As a result, the Company purports to have developed operational infrastructure
over the past seventeen years, including extensive distribution channels and convenient access
to strategic railway lines. Moreover, the Company purports to benefit from dedicated rail spurs
that connect their storage depots to the main railway lines to create efficient inflow and outflow
of Longwei's petroleum Products.

57. According to the 2010, 2011, and 2012 Annual Reports filed on Forms 10-K, the
Company has its own enterprise resource planning ("ERP") computer system "that manages and
monitors the inflow and outflow of the Products at its locations. ***The system ties into the
Company's inventory accounting system to monitor and manage inventory levels and
automatically updates on a real-time basis***."

58. For fiscal year ended June 30, 2010, June 30, 2011, and June 30, 2012,
respectively, Longwei reported that 91%, 92.9%, and 91.7% of the Company's revenues,
respectively, were derived from the sale of gasoline and diesel fuel. Longwei boasts that it

21

currently has three fuel oil storage facilities with total storage capacity of 220,000 metric tons of Products: Taiyuan, Gujiao, and Huajie.

### 1.      The Taiyuan Facility

59.      The Company's headquarters are located in Taiyuan City, Shanxi Province. The Taiyuan Facility has a total of eight storage tanks with a capacity to store approximately 50,000 metric tons of Products (approximately 18 million gallons). Because this location is inland, all fuel deliveries and distribution are conducted either by truck or by railroad. Longwei maintains delivery and distribution platforms, including a dedicated rail spur and a vehicle loading and unloading fuel depot station at the Taiyuan Facility. The Company also maintains a retail outlet at this location. The Company reported product sales revenue contribution from the Taiyuan Facility for the years ended June 30, 2012, 2011, and 2010 were $256.3 million, or 50% of the Company's total revenues, $269.9 million, or 56% of the Company's total revenues, and $238.3 million, or 69% of the Company's total revenues, respectively. All of the Company's product sales revenue earned prior to the year ended June 30, 2009 were earned at the Taiyuan Facility, which began operations in 1995.

### 2.      The Gujiao Facility

60.      On August 7, 2007, the Company entered into an agreement to purchase the assets of Shanxi Heitan Zhingyou Petrochemical Co., Ltd ("Shanxi Heitan"), which were located in Gujiao, Shanxi Province, for approximately $17 million. Longwei paid a deposit of approximately $9.2 million the same day. On February 5, 2008, the purchase agreement was amended to change the terms of the purchase agreement such that the total purchase price was increased to approximately $30 million rather than $17 million and the Company would not only acquire the assets of Shanxi Heitan but Longwei would also acquire a 95% ownership of Shanxi Heitan. The remaining 5% of the Shanxi Heitan was not eligible to be acquired under

22

PRC law and was therefore allocated by Shanxi Heitan to "an employee of the Company," who was in fact Defendant Cai. At the time Longwei acquired Shanxi Heitan for the additional payment of $13 million above the letter of intent, yet according to Longwei's own 2010 Form 10-K, "Shanxi Heitan was a dormant operating entity upon the date of acquisition." Moreover, according to the Company's most recent Annual Report filed with the SEC on Form 10-K for 2012 ("2012 10-K"), Shanxi Heitan still has "minimal business operations, . . . [and is] unlikely to have profits in future periods."

61.     The Company then acquired control of the Gujiao Facility in January 2009 and claimed to begin operations in November 2009. The Company claimed to have retrofitted the existing storage tanks and built a new office and customer service center at the location. The Gujiao Facility has a total of eight storage tanks with a capacity to store approximately 70,000 metric tons of Products (approximately 25 million gallons). Longwei represents that it maintains delivery and distribution platforms from the Gujiao Facility as well, including a dedicated rail spur and a vehicle loading and unloading station. The Company's reported product sales revenue contribution from the Gujiao Facility for the years ended June 30, 2012, 2011, and 2010 were $233.8 million, or 45.7% of the Company's total revenues, $188.2 million or 39% of the Company's total revenues, and $74 million or 22% of the Company's total revenues, respectively. The Gujiao Facility is located approximately thirty kilometers north of the Taiyuan Facility.

### 3.     The Huajie Facility

62.     In March 2011, the Company entered into a letter of intent to purchase the assets of Huajie Petroleum located in Xingyuan Township, Fanshi County, in northern Shanxi Province. The assets included fuel storage tanks with 100,000 metric ton capacity with

accessory facilities and equipment, delivery and distribution platforms, including a dedicated

rail spur and a vehicle loading and unloading station, and a 3,000-square-meter office building.

      63.    Despite the fact that the Taiyuan and Gujiao Facilities were nearly idle, Longwei

completed the acquisition of the Huajie Facility on September 26, 2012.  On October 15, 2012,

Longwei issued a press release entitled "Longwei Petroleum Commences Operations at its

Huajie Fuel Storage Depot – Huajie facility opens new market for the Company in northern

Shanxi Province."  The press release stated, in pertinent part, as follows:

> Longwei received its first shipment of petroleum to the new Huajie facility last
> week and began to sell product to customers on October 11, 2012.  The
> Company's engineers and staff have been working on the facility assets since
> closing to bring it to operational status and begin distribution activities.  Longwei
> finalized the RMB 700 million (approximately US $110.6 million) purchase of
> the assets of Huajie Petroleum Co., Ltd. ("Huajie"), a fuel storage depot with a
> 100,000-metric-ton storage capacity, on September 26, 2012.

\*          \*          \*

> "We are confident we can quickly ramp up sales at the Huajie facility based on
> regional demand and relationships we have established," said Michael Toups,
> Chief Financial Officer of Longwei.  "Closing on the Huajie facility has allowed
> us to increase our regional presence and attract new customers.  With the addition
> of the Huajie facility, we have strengthened our lead as the largest non-state-
> owned fuel storage and distribution business in the province."

      64.    Thus, Longwei admitted that the Huajie assets were non-operational with no

revenue-producing history and had no inputs, no operating history, and no employees when it

was acquired.  Nevertheless, in a press release dated December 20, 2012, Longwei represented

that "[t]he Huajie facility represented approximately 18.9% or 16,290 [metric tons] of the total

sales volume for the two-month period ended November 30, 2012."

     **B.**    **Longwei's Financing Activities**

      65.    Prior to the start of the Class Period, Defendants raised tens of millions of dollars

through the private placement of various securities, and paid promotional, professional, and

24

consulting fees by issuing millions of additional unregistered shares of common stock, convertible preferred stock, and/or warrants to purchase its common stock.

66.     Then, after several S-l filings and amendments, on November 10, 2008, the SEC declared effective the Company's Registration Statement (No. 333-146921) facilitating the sale of 3.75 million shares of the Company's common stock by early investors and others at $1.50 per share, for $5.625 million in proceeds.  At the time of the 2008 offering, according to Longwei, "[t]he Company ha[d] a total of 52 stockholders, of which 45 [were] selling stockholders."

67.     On November 19, 2008, the Company's common stock began trading on the OTC Bulletin Board stock market in the U.S.

68.     On October 29, 2009, the Company conducted a private placement pursuant to which it issued and sold 13,499,274 units, with each unit consisting of:  (i) Series A Convertible Preferred Stock, convertible to common stock at $1.10 per share ("Convertible Preferred Shares"); and (ii) a warrant to purchase one share of Longwei common stock at $2.255 per share ("Warrants"), for an aggregate purchase price of $14,849,201.50 in proceeds.  The Convertible Preferred Shares were convertible into shares of the Company's common stock based on a one-to-one conversion ratio, at an initial conversion price of $1.10 per share, subject to adjustment.  The Warrants were exercisable for a term of three years (from October 29, 2009) at an exercise price of $2.255 per share (the "Exercise Price").

69.     To incentivize investors to participate in the October 2009 Financing, the Company entered into the Make Good Escrow Agreement, whereby Defendants Cai and Xue placed an aggregate of 13,499,274 shares of their personal Longwei common stock into an escrow account (the "Escrow Shares"), to be distributed if certain financial milestones of the

Company were not met in the fiscal year 2010.  Pursuant to the terms of the Make Good Escrow

Agreement, if the after-tax net income reported in the Company's 2010 Annual Report was less

than $23,900,000 (subject to certain exclusions), the October 2009 Financing participants were

entitled to receive the Escrow Shares on a "pro rata" basis (determined by dividing each

investor's investment amount by the aggregate of all investment amounts delivered to the

Company by the investors under the October 2009 Financing) for no additional consideration.

70.     The Company also issued an aggregate of 155,000 shares of common stock

valued at $317,750 to four individuals for services related to the October 2009 Financing.

Moreover, the National Securities Corporation acted as the lead placement agent on the October

2009 Financing private placement and was awarded warrants to purchase 1,349,927 shares of

Longwei common stock.

71.     Following a series of Form S-1 Registration Statement filings commencing on

December 24, 2009 and amendments on February 2, 2010 and March 5, 2010, the SEC declared

effective the Company's Registration Statement (No. 333-164020) facilitating the sale of

4,724,747 shares of the Company's common stock by certain early investors and others at $2.28

per share, for $10,772,423.16 in proceeds on March 8, 2010.  The securities offered in the 2010

offering consisted of 4,724,747 shares of Longwei common stock issuable upon conversion of

outstanding Convertible Preferred Shares issued in the October 2009 Financing.

72.     On July 21, 2010, Longwei, which had previously been trading on the OTC

Bulletin Board, announced that the Company had received approval to list its common stock on

the NYSE, which began trading under the ticker symbol "LPH" on July 22, 2010.  The

Company issued a press release stating, in pertinent part:

> "We are excited to move to NYSE Amex and believe that this transition will bring
> greater value to our shareholders through increased investor visibility," Mr. Cai

26

Yongjun, Chairman and CEO of Longwei, commented. "I can think of no better way to finish a strong fiscal year and jumpstart a new one than with this pivotal move to a senior exchange. We welcome the increased responsibility and accountability that the new listing will entail, and we see it as a validation of the trust and credibility that we have worked so hard to build with our investors. As a leading petroleum distributor in China, Longwei is strongly positioned to continue expanding its reach in the coming year. The transition to NYSE Amex enables us to increase awareness in the investment community and attract a larger, more diverse shareholder base. We would like to thank our shareholders, employees, and other stakeholders for their ongoing support as we move forward into what will undoubtedly be a record year for Longwei Petroleum."

73.     Following a series of Form S-3 Registration Statement filings commencing on

December 13, 2010 and amendments on January 14, 2011 and February 7, 2011, the SEC

declared effective the Company's Registration Statement (No. 333-171139) on February 18,

2011 facilitating the registration of an aggregate amount of $83,507,195.80 in Company

securities, which included the registration of Company shares underlying the outstanding

Warrants and a $50 million shelf registration of Longwei common stock to be sold "from time

to time" (the "Shelf Registration Statement").  The Shelf Registration Statement further

contained an unqualified audit opinion from CvWB.  Through the Shelf Registration Statement,

Longwei registered up to an aggregate of 12,887,383 shares of common stock which were

issued or are issuable upon exercise of the Warrants sold in the October 2009 Financing.

According to a press release issued on February 22, 2011 announcing the Shelf Registration

Statement:

> [T]he Company's warrants associated with its October 2009 financing guarantees that the remaining outstanding warrants will be exercised "for cash" rather than on a cashless basis, which will provide the Company with an additional $26 million in cash when the warrants are fully exercised.
>
> Mr. Cai Yongjun, Chairman and CEO of Longwei, commented, "Rising fuel prices and growing demand continue to confirm our business model. We are looking to significantly expand our footprint in the region, which would drive top-line revenue growth and earnings. The registration of the warrants is for the underlying shares already included in our diluted EPS, which will provide capital

27