**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ x
                             :
                             :   C.A. No. 1:13-cv-00214-HB
                             :
                             :   CLASS ACTION
In re: LONGWEI PETROLEUM      :
INVESTMENT HOLDING LIMITED  :   JURY TRIAL DEMANDED
SECURITIES LITIGATION         :
                             :
                             :
                             :
                             :
------------------------------------------------------ X
This Document Relates To: All Actions

# CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

# PART III

oil products either.  There was a lot, before."  The CCTV reporter also visited the Taiyuan City

SAT Collection Management Office and spoke with an officer there.  The officer stated that for

the company they had on file, Taiyuan City Longwei Economic and Trading Co., Ltd., "from

January to December last year (2012), its total revenue was RMB 2.64 million."  Or

approximately $428,764 (U.S.), at the current conversion rate.

137.    Independent interviews with local residents performed by Plaintiffs'

Investigators during June 2013 further confirmed the massively overstated fuel sales Longwei

perpetrated during the Class Period.  Specifically, Plaintiffs' Investigators visited the Taiyuan

Facility to tour the grounds and discuss Longwei's wholesale and retail petroleum business with

locals.  During one conversation with a local peddler who operated a convenience store near the

Taiyuan Facility for the past five years, Plaintiffs' Investigators discovered that Longwei's

wholesale oil business has been nonexistent "the last two or three years," as the peddler has "not

seen them buy or sell any oil."  Moreover, according to the peddler, the retail gas station at the

Taiyuan Facility does "[n]ot operate good at all.  Sometimes they are lack of gas, so I often do

not fill gas at that station."  As far as the railroad spur purportedly supplying the Taiyuan

Facility with the Products it sold during the Class Period, the peddler "could not remember

[how long ago] it was used.  It has not been used for at least two years."

138.    Plaintiffs' Investigators thereafter visited the retail gas station at the Taiyuan

Facility, where the gas station attendant informed them that the station was out of Number 93

gas, which is one of the main types of fuel for automobiles in the PRC.  When Plaintiffs'

Investigators expressed surprise that a retail gas station for a company purportedly engaged in

wholesale oil business was out of gas, the gas station attendant responded by stating that "I d[id]

not know who do wholesale oil business. I only know the gas station does not have #93 gas."

Finally, when asked if Longwei transports oil via the railway, the gas station attendant responded by stating that "I do not know who use the railway. It is none of my business. The railway is full of grasses.  Do you think it could be used to transport # 93 for you?"

139.    Plaintiffs' Investigators visited the Taiyuan Facility to photograph the railroad spur, which is pictured below:





140.    In June 2013, Plaintiffs' Investigators also visited the Gujiao Facility.  One conversation with an employee at the Facility revealed that the Company "do[es] not do any business," and that he, along with the twenty or so employees at the facility, basically "have nothing to do" because "[a]ll the big oil barrels are empty."  When asked why the barrels were empty, the employee stated that "[t]he boss never buys any oil."  Plaintiffs' Investigators then visited a local restaurant about 200 meters from the Gujiao Facility.  The restaurant's owner confirmed that the new owner of the Gujiao Facility (Longwei) does not do any wholesale oil business.  According to restaurant owner, Defendant Cai and the Company merely "built up some new building, such as the gate.  He [Defendant Cai] spent money on the new building, but he did not do any business. It's strange, right?"  However, according to the restaurant owner, "[a]s I know, this owner is the fourth owner during the last ten years. The first three truly conducted oil-wholesale business."  Finally, the restaurant owner confirmed that the employees at the Gujiao facility "have nothing to do," resulting in a very low salary with no insurance.  As a result, none of the local employees have "enough money to come here [his restaurant]."

141.    Plaintiffs' Investigators visited the Gujiao Facility to photograph the railroad spur, which is pictured below:



142.    In June 2013, Plaintiffs' Investigators also visited the Huajie Facility.  Plaintiffs'

Investigators observed that the roads in the surrounding area were bumpy and in general

disrepair, certainly not fit for large oil tanker trucks required to conduct wholesale oil

transactions that Longwei purportedly engaged in at the Huajie Facility.  According to a local

corn farmer and his wife, there are three oil-storage facilities in the area, two big and one small.

However, the local resident stated that "[a]ll the three storage facilities have not been operating

for years, so none of the companies will repair the road."  The local farmer was familiar with

the recent change in ownership at the Huajie Facility during the Class Period, and stated that

even after the recent acquisition, Huajie still has not operated any sort of wholesale oil business.

Finally, according to the local resident's wife, "[t]he railway has not been used for a long time."

**B.    Undisclosed Investments And Related Party Transactions**

143.    During the Class Period, Longwei failed to disclose a $32 million investment in a

tourism business by its subsidiary.  According to the *GeoInvesting* Report and SAIC

documentations set forth therein, Defendant Cai and Zhonghe, a claimed non-operating

Longwei subsidiary, owned 10% and 90% respectively of a tourism project called Shengjing

Mountain Tourism District, in Wendeng City, Shandong Province.  Shandong Jinriyue Tourism

Development Co., Ltd. ("Jinriyue Tourism"), established in October 2009, was the company

developing and managing the project.  Longwei never disclosed any details regarding its

involvement in the project.

144.    The SAIC filing reproduced below demonstrates that Zhonghe was a 90%

shareholder of Jinriyue Tourism, and Defendant Cai owned the remaining 10% of the shares of

Jinriyue Tourism.  Below is an image of the SAIC file for Jinrijue Tourism, as disclosed in the

*GeoInvesting* Report, indicating Longwei's large investment in the project:

145.    Based on public information in China, as of November 2011, Zhonghe invested more than $32 million in this tourism project and even planned to invest as much as $222 million.

## VII.    POST CLASS PERIOD EVENTS

146.    On January 28, 2013, Defendant Cole resigned from his position as an independent director, chairman of the Board's Audit Committee, and a member of the Board's Nominating and Compensation Committees.  According to Cole's January 28, 2013 resignation letter, attached as an exhibit to the Form 8-K Longwei filed with the SEC, the Company's Audit Committee resolved to undertake an independent investigation on January 15, 2013, relating to the material revealed by *GeoInvesting*.  The Audit Committee further resolved to engage independent counsel and forensic accountants in order to carry out the investigation.  On the same date, the Audit Committee submitted its request to the Board and requested that the Board approve the Audit's Committee's resolutions so that the Audit Committee could commence such investigation.  However, the Board refused to approve the Audit Committee's resolutions.  As a result, Defendant Cole offered his resignation.

147.    On January 30, 2013, non-defendant Xiaoping also resigned from her position as an independent director and member of the Company's audit, compensation and nominating committees.  Thus, within less than one month of the release of the *GeoInvesting* Report, a majority of both the independent directors and the Audit Committee resigned.  As a result of the resignations, on February 6, 2013, the Company received notice from the NYSE that the Company was not in compliance with Section 801(h) of the NYSE Company Guide (the "Company Guide") requiring at least 50% of the directors on the Company's Board of Directors be independent and Section 803(B)(2)(c) of the Company Guide in that the Company, at that time, had only one out of the requisite two members on its Audit Committee.

148.    On February 15, 2013, Longwei filed a Notification of Late Filing for its Form
10-Q for the period ending December 31, 2012, and has been unable to ever again file another
quarterly report since that date.

149.    On March 5, 2013, Longwei received a Notice of Delisting from the NYSE that
its securities were subject to being delisted for failure to comply with Sections 132(e), 134,
801(h), 803(B)(2)(c), 803(B)(4), 1101, 1003(d), and 1003(f)(iii) of the NYSE Company Guide,
resulting from the two board member resignations, and failure to timely file the Company's
quarterly report on Form 10-Q for the fiscal quarter ended December 31, 2012 within the
requisite time period, including the permissible extension period.

150.    Finally, on March 22, 2013, Longwei filed a Form 25 with the SEC, formally
providing that trading in the Company's stock was halted by the NYSE.

151.    On May 30, 2013, Anderson Bradshaw resigned as the Company's independent
registered public accounting firm, citing "a limitation on the scope of its work imposed by the
Company." The Company has yet to file another quarterly or annual report with the SEC.

## VIII.   DEFENDANTS' GAAP, GAAS, AND INTERNAL CONTROLS VIOLATIONS

### A.     Defendants' GAAP Violations

152.    The SEC requires that publicly-traded companies, such as Longwei, present
financial statements in accordance with GAAP. GAAP are those principles recognized by the
accounting profession and the SEC as the uniform rules, conventions, and procedures necessary
to define accepted accounting practices at a particular time. GAAP are the official standards
accepted by the SEC and promulgated in part by the Financial Accounting Standards Board
("FASB"). On July 1, 2009, FASB enacted the Accounting Standards Codification ("ASC") as
the single source of authoritative GAAP effective for interim and annual periods ending after
September 15, 2009.

153.    SEC Regulation S-X states that "[f]inancial statements filed with the SEC that are not prepared and presented in accordance with [GAAP] . . . will be presumed to be misleading or inaccurate, despite footnote of other disclosures. . ." 17 C.F.R. § 210.4-01(a)(1). SEC Regulation S-X requires that interim financial statements also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying the company's most recent annual financial statements. 17 C.F.R. § 210.10-01(a)(5).

154.    The responsibility for preparing financial statements (including the footnotes to the financial statements) in conformity with GAAP rests with a company's management, as set forth in Section 110.03 of the AICPA Auditing Standards (*Responsibilities and Functions of the Independent Auditor*):

> ***The financial statements are management's responsibility…Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management… Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***. (Footnote omitted).

155.    During the Class Period, Longwei:  (i) failed to disclose that its wholesale fuel sales were vastly exaggerated, and at time, virtually nonexistent, contrary to Longwei's public statements; and (ii) failed to disclose a material undisclosed investment totaling $32 million in a tourism project called Shengjing Mountain Tourism District, resulting in Longwei's Zhonghe subsidiary owning 90% of the venture and Defendant Cai owning the remaining 10%.  As such, the Company materially misstated its financial statements as of and for the years ended June 30, 2010, June 30, 2011, and June 30, 2012, (and related Forms 10-K).  The improper accounting

practices in which Longwei engaged, as well as Defendants' misrepresentations and omissions,
were material breaches of GAAP, Company policy, and/or SEC Regulations.

### 1.    Overstatement Of Revenues

156.    Plaintiffs are not able to state the precise amount that revenues have been
overstated since the beginning of the Class Period.  Based upon statements by local residents,
however, the Taiyuan Facility has been virtually idle since at least 2011, and the Gujiao and
Huajie Facilities have been idle since they were acquired by Longwei.  These statements have
been confirmed by photo and video surveillance once Defendant Toups failed to honor his
promise in May 2011 to post the very same video on the Company's website.  Nevertheless,
between January 1, 2011 and September 30, 2012, Longwei reported a 10.76% increase in
product sales from the Taiyuan and Gujiao Facilities, from $114.4 million in the third fiscal
quarter of 2011 (January 1, 2011 through March 31, 2011) to $128.2 million during the first
fiscal quarter of 2013 (July 1, 2012 through September 31, 2012), posting record results for
each quarter.  Then, Longwei added the non-operational Huajie Facility in late September,
2012, and immediately "reported its revenue from product sales increased 35.0% to $107.5
million" and "product sales volume increased 26.1%" for October and November 2012, 18.9%
of which was attributed to the addition of the Huajie facility."  These revenues and product sales
were drastically over-stated by as much as a factor of 882 times.

157.    ASC 605-10-25-1 states that the recognition of revenue and gains of an entity
during a period involves consideration of the following two factors:

a)    Being realized or realizable. Revenue and gains generally are not
recognized until realized or realizable. Paragraph 83(a) of FASB Concepts
Statement No. 5, Recognition and Measurement in Financial Statements of
Business Enterprises, states that revenue and gains are realized when
products (goods or services), merchandise, or other assets are exchanged
for cash or claims to cash. That paragraph states that revenue and gains are
realizable when related assets received or held are readily convertible to

known amounts of cash or claims to cash.

b)      Being earned. Paragraph 83(b) of FASB Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, states that revenue is not recognized until earned. That paragraph states that an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. . .  (ASC 605-10-25-1).

158.   Paragraph 84 of FASB's *Statement of Financial Accounting Concepts No. 5*

(hereinafter "FASCON 5"), which is effectively subsumed by ASC 605, *Revenue Recognition*,

continues, in relevant part:

In recognizing revenues and gains:

a)      The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery).

b)      If sale or cash receipt (or both) precedes production and delivery (for example, magazine subscriptions), revenues may be recognized as earned by production and delivery.

(Footnotes removed; emphasis added.).

159.   The SEC has issued accounting guidance from time to time in the form of Staff

Accounting Bulletins, also referred to as "SABs."  SAB No. 104, *Revenue Recognition* ("SAB

104"), was issued to discuss the application of, and to formally codify, existing accounting

literature surrounding the proper recognition of revenue, including the aforementioned

FASCON 5, ¶¶ 83-84, by SEC registrants such as Longwei.  The elements of SAB 104 have

also been included in the FASB's codification of revenue recognition rules, including the

following, in relevant part:

…revenue should not be recognized until it is realized or realizable and earned. Concepts Statement 5, paragraph 83(b) states that "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues" [footnote reference omitted]. Paragraph 84(a) continues "the two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)" [footnote reference omitted].

The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:

    i.        Persuasive evidence of an arrangement exists,

    ii.       Delivery has occurred or services have been rendered,

    iii.     The seller's price to the buyer is fixed or determinable, and

    iv.     Collectibility is reasonably assured.

(Footnotes removed.)

160.    As detailed above, throughout the Class Period, Longwei did not deliver the fuel Products represented in its financial results, and therefore improperly reported revenue under the foregoing GAAP provisions.

## 2.    Undisclosed Investments And Related Party Transactions

161.    Zhonghe is a subsidiary of Longwei.  Throughout the Class Period, Longwei's audited financial statements failed to disclose that Zhonghe had invested $32 million and had committed to invest up to an additional $222 million in a tourism project called Shengjing Mountain Tourism District, co-owned by Defendant Cai.

162.    The 2012 Form 10-K represents that:

The consolidated financial statements of the Company presented for the years ended June 30, 2012 and 2011 include the financial statements of Longwei Petroleum Investment Holding Limited, Longwei BVI, Taiyuan Yahua Energy

Conversion Ltd. ("Taiyuan Yahua"), and its direct and indirect subsidiaries, Shanxi Zhonghe Energy Conversion Ltd. ("Zhonghe"), Taiyuan Longwei Economy & Trading Co., Ltd., ("Taiyuan Longwei") and Shanxi Heitan Zhingyou Petrochemical Co., Ltd. Intercompany transactions and balances are eliminated in consolidation.

163.     The 2012 Form 10-K further represents that Zhonghe has "minimal business operations [and is] unlikely to have profits in future periods."

164.     In fact, Shandong Jinriyue Tourism Development Co., Ltd. ("Jinriyue Tourism") was established to finance the tourism project called Shengjing Mountain Tourism District, in Wendeng City, Shandong Province ("Shengjing").  Based on information in China, as of November 2011, Zhonghe invested more than $32 million in this tourism project and even planned to invest as much as $222 million.

165.     Longwei failed, however, in its public filings relating to the relevant timeframe, to ever disclose this investment in Jinriyue Tourism and failed, similarly, to reflect its position in what was also a related party.

166.     ASC 323 is the primary source of accounting and disclosure guidance relating to investments in subsidiaries and, similarly, joint ventures.  As set forth therein, critical to the determination of whether an investment in a subsidiary constitutes an investee entity whose operations should be consolidated into the financial statements of an investor, is the question of whether the parent or investor has the ability to exercise significant control over the investee entity.  As stated in ASC 323, "the ability to exercise significant influence over operating and financial policies of an investee may be indicated in several ways, including the . . . "[e]xtent of ownership by an investor in relation to the concentration of other shareholdings."

167.     The standard further states that "[a]n investment (direct or indirect) of 20 percent or more of the voting stock of an investee shall lead to a presumption that in the absence of

predominant evidence to the contrary an investor has the ability to exercise significant influence

over an investee." (ASC 323-10-15-8).  As stated above and throughout this Complaint,

Longwei effectively held a 90% investment in Jinriyue Tourism and yet still failed to

consolidate and disclose to the investing pubic said investment, in violation of GAAP and SEC

rules.

168.    ASC 323 states that "an investor shall recognize an investment in the stock of an

investee as an asset."  (ASC 323-10-25-2).  The amount of the investment shall be shown in the

balance sheet of an investor as a single amount.  (ASC 323-10-45-1).  It further states that,

"[u]nder the equity method,[9] an investor shall recognize its share of the earnings or losses of an

investee in the periods for which they are reported by the investee in its financial statements

rather than in the period in which an investee declares a dividend."  (ASC 323-10-35-4).

Continuing, "[a]n investor shall adjust the carrying amount of an investment for its share of the

earnings or losses of the investee after the date of the investment and shall report the recognized

earnings or losses in income," as well as that "[t]he amount of the adjustment of the carrying

amount [of the investment] shall be included in the determination of net income by the

investor."  (ASC 323-10-35-5).

---

[9]    ASC 323 states that "[i]nvestors in unincorporated entities such as partnerships and
other unincorporated joint ventures generally shall account for their investments using the
equity method of accounting by analogy to Subtopic 323-10 if the *investor* has the ability to
exercise *significant influence* over the *investee*." (ASC 323-3-25-1).  It is unclear how,
exactly, Longwei accounted for its investment in Jinriyue Tourism and/or how Jinriyue Tourism
was structured as an entity.  The foregoing guidance indicates, however, that whether Jinriyue
Tourism was an incorporated entity or an entity function as a partnership or other
unincorporated entity, Longwei should have accounted for its investment in such using the
equity method of accounting, the rules pertaining to which call for consolidation, disclosure,
and impact upon the financial statements of the investor company for the earnings and/or losses
of the investee.

169.    In the foregoing circumstances, ASC 323 prescribes that gains and losses, too, shall be shown in an investor's income statement as a single amount.  (ASC 323-10-45-1). There is no indication in Longwei's public filings during the Class Period that Longwei consolidated the operations of Jinriyue Tourism and/or disclosed its significant investment in that entity.

170.    This failure by the Company to disclose the investment or adjust the carrying amount of the investment is exacerbated by the fact that Defendant Cai, an obviously related party, owned more than 10% of Jinriyue Tourism.

171.    ASC 850 (emanating primarily from FAS No. 57 *Related Party Transactions* (hereinafter "FAS 57")) is the primary source of accounting and disclosure guidance relating to transactions with related parties.  FAS 57 provided examples of transactions that would qualify as related party transactions, including transactions between an entity and the following "related parties":

- Affiliates of the enterprise; *i.e.*, "…part[ies] that, directly or indirectly through one or more intermediaries, control[], [are] controlled by, or [are] under common control with an enterprise";

- Principal owners of the enterprise; i.e., "[o]wners of record or known beneficial owners of more than 10 percent of the voting interests of the enterprise";

- Management of the enterprise; *i.e.*,:

  - Persons who are responsible for achieving the objectives of the enterprise and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policymaking functions.  Persons without formal titles also may be members of management. . . .

73

(FAS 57, ¶¶ 1, 24)  (Emphasis added) (Footnote added).

172.    According to FAS 57, financial statements presented in accordance with GAAP

must include the disclosure of material related party transactions (other than normal

compensation arrangements for employees, expense allowances, and/or other similar items in

the ordinary course of business).

173.    Disclosure, or lack thereof, of information about transactions with or investments

in related parties is significant because it affects the usefulness, relevance, reliability, and

completeness of an entity's financial statements.  Such concepts underlie the overall objectives

and characteristics of financial reporting in accordance with GAAP (introduced herein, and

discussed in further detail below in this statement).  Specifically, the primary objective of

financial reporting is to provide information in financial statements, disclosures, and/or in other

means required by the SEC that is useful and comprehensible to the users of an entity's

financial statements in making rational business and economic decisions.  (FASCON 1, ¶¶ 9,

16, 33-34, 40-43).  Disclosures regarding related party transactions affect the usefulness of an

entity's financial statements in the following manner, in relevant part:

> Information about transactions with related parties is useful to users of financial
> statements in attempting to compare an enterprise's results of operations and
> financial position with those of prior periods and with those of other enterprises. It
> helps them to detect and explain possible differences. Therefore, information
> about transactions with related parties that would make a difference in decision
> making should be disclosed so that users of the financial statements can evaluate
> their significance.

(FAS 57, ¶18)

174.    Disclosures regarding related party transactions affect the reliability of an

entity's financial statements, including in the following manner:

> Without disclosure to the contrary, there is a general presumption that transactions
> reflected in financial statements have been consummated on an arm's-length basis

74

between independent parties.  However, that presumption is not justified when related party transactions exist because the requisite conditions of competitive, free-market dealings may not exist. Because it is possible for related party transactions to be arranged to obtain certain results desired by the related parties, the resulting accounting measures may not represent what they usually would be expected to represent.  Reduced representational faithfulness and verifiability of amounts used to measure transactions with related parties weaken the reliability of those amounts. That weakness cannot always be cured by reference to market measures because in many cases there may be no arm's-length market in the goods or services that are the subject of the related party transactions.  (FAS 57, ¶ 15).

175.    Beyond the aforementioned GAAP disclosure requirements related to related party transactions, the SEC also requires certain disclosures in registrants' financial statements. SEC Regulation S-X states that the following (amongst other things) must be set forth on the face of the appropriate financial statements or in appropriately-captioned footnotes:

(k)    Related party transactions which affect the financial statements.

    1)    Related party transactions should be identified and the amounts stated on the face of the balance sheet, income statement, or statement of cash flows.

    2)    In cases where separate financial statements are presented for the registrant, certain investees, or subsidiaries, separate disclosure shall be made in such statements of the amounts in the related consolidated financial statements which are (i) eliminated and (ii) not eliminated.  Also, any intercompany profits or losses resulting from transactions with related parties and not eliminated and the effects thereof shall be disclosed.  [17 C.F.R. § 210.4-08(k)]

176.    Longwei's consolidated financial statements for the relevant timeframe failed to comply with the accounting guidance relating to both investments and related party disclosure set forth above, and thereby violated GAAP (ASC 323 and ASC 850) and SEC Regulation S-X, due to the omission of information relating to (among other things), not only Longwei's relationship with a related party but a significant investment in such entity.

### B.    Defendants' GAAS Violations

177.    GAAS, as adopted and supplemented by PCAOB standards, represent the guidelines by which an audit must be planned and performed.  The PCAOB was established by the Sarbanes-Oxley Act of 2002, and is responsible for the establishment of auditing and related professional practice standards that must be followed by registered public accounting firms and by auditors when performing audits of the financial statements of public and registered filers. On April 16, 2003, the PCAOB adopted, as its interim standards, GAAS, as summarized in AU 150, and related interpretations in existence on that date.  Accordingly, an auditor's reference to "the standards of the Public Company Accounting Oversight Board (United States)" in its audit opinions, includes a reference to GAAS in existence as of April 16, 2003, to the extent such GAAS has not been expressly superseded by standards established by the PCAOB.

178.    The general, fieldwork, and reporting standards approved and adopted by the membership of the AICPA, and which must be followed throughout all audits, are as follows:

*General Standards*
1.    The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.
2.    In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.
3.    Due professional care is to be exercised in the performance of the audit and the preparation of the report.

*Standards of Field Work*
1.    The work is to be adequately planned and assistants, if any, are to be properly supervised.
2.    A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.
3.    Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*
1.    The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

2.      The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3.      Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4.      The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the reasons therefore should be stated.  In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.  (Statement on Auditing Standards § ("AU") 150, *Generally Accepted Auditing Standards* ("AU 150").02).

179.    In order to satisfy the obligations of an external auditor under GAAS and the

PCAOB standards, an accountant is required to, among many other things, exercise what is

referred to as "due professional care" in the conduct of his/her audits, as mentioned in the third

general standard above.  AU 230 also states, in relevant part:

This standard requires the independent auditor to plan and perform his or her work with due professional care. Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting.  (AU 230.02).

*                    *                    *

An auditor should possess "the degree of skill commonly possessed" by other auditors and should exercise it with "reasonable care and diligence" (that is, with due professional care).  (AU 230.05).

*                    *                    *

Due professional care requires the auditor to exercise *professional skepticism*. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence.  The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. (AU 230.07).

*                    *                    *

Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence.  Since evidence is gathered and evaluated throughout the audit, professional skepticism should be

exercised throughout the audit process.  (AU 230.08).

180.    Ultimately, given the nature of the fraud perpetrated by Longwei in the instant matter, it is evident that the Auditor Defendants failed not only to exercise due professional care and/or professional skepticism, but failed also to adequately plan and perform the audits during the Class Period in accordance with GAAS.  AU 311, Planning and Supervision ("AU 311") states the following, in relevant part:

> Obtaining an understanding of the entity and its environment, including its internal control, is an essential part of planning and performing an audit in accordance with generally accepted auditing standards. The auditor must plan the audit so that it is responsive to the assessment of the risk of material misstatement based on the auditor's understanding of the entity and its environment, including its internal control. Planning is not a discrete phase of the audit, but rather an iterative process that begins with engagement acceptance and continues throughout the audit as the auditor performs audit procedures and accumulates sufficient appropriate audit evidence to support the audit opinion. As a result of performing planned audit procedures, the auditor may obtain disconfirming evidence that might cause the auditor to revise the overall audit strategy.  (AU 311.03; footnotes removed).

181.    Notwithstanding the foregoing, the Auditor Defendants failed to develop an audit plan that would have effectively ensure not only that the Company's financial statements were fairly stated, in all material respects, but that the assets and results of operations reflected in those financial statements even existed, or were even occurring.  In this regard, the Auditor Defendants failed to adequately employ and adhere to GAAS standards sufficient to discharge of their responsibilities with respect to issuing unqualified opinions on the financial statements of Longwei for the relevant timeframe.

182.    Similarly, it would have been impossible for the Auditor Defendants to have obtained sufficient competent evidential matter, as required of it by AU 326, Audit Evidence ("AU 326") and the third standard of fieldwork listed by GAAS and excerpted above, given the apparent fact that Longwei's operations were nothing but a sham.

183.   AU 326 states the following, in relevant part:

Audit evidence is all the information used by the auditor in arriving at the conclusions on which the audit opinion is based and includes the information contained in the accounting records underlying the financial statements and other information. Auditors are not expected to examine all information that may exist. Audit evidence, which is cumulative in nature, includes audit evidence obtained from audit procedures performed during the course of the audit and may include audit evidence obtained from other sources, such as previous audits and a firm's quality control procedures for client acceptance and continuance. (AU 326.02; footnotes removed).

184.   In the context of its engagements with Longwei, the Auditor Defendants clearly could not have obtained sufficient, competent evidential matter as none such existed.  As discussed throughout this Complaint, the Company did not have assets nor did it sell or deliver the majority of the petroleum Products that were reflected in Longwei's publicly-filed income statements for the relevant timeframe.  To that end, it was not possible for the Auditor Defendants to have satisfied the particular audit assertions of "existence" (used for assets) or "accuracy" and "completeness" for revenue.

185.   AU 326 also provides the following with respect to audit evidence:

Sufficiency is the measure of the quantity of audit evidence. Appropriateness is the measure of the quality of audit evidence, that is, its relevance and its reliability in providing support for, or detecting misstatements in, the classes of transactions, account balances, and disclosures and related assertions. The auditor should consider the sufficiency and appropriateness of audit evidence to be obtained when assessing risks and designing further audit procedures. The quantity of audit evidence needed is affected by the risk of misstatement (the greater the risk, the more audit evidence is likely to be required) and also by the quality of such audit evidence (the higher the quality, the less the audit evidence that may be required). Accordingly, the sufficiency and appropriateness of audit evidence are interrelated. However, merely obtaining more audit evidence may not compensate if it is of a lower quality.  (AU 326.06).

\*            \*            \*

The reliability of audit evidence is influenced by its source and by its nature and is dependent on the individual circumstances under which it is obtained. Generalizations about the reliability of various kinds of audit evidence can be

made; however, such generalizations are subject to important exceptions. Even
when audit evidence is obtained from sources external to the entity, circumstances
may exist that could affect the reliability of the information obtained. For
example, audit evidence obtained from an independent external source may not be
reliable if the source is not knowledgeable. . . . (AU 326.08).

186.    And additionally, AU 326 provides the following:

When information produced by the entity is used by the auditor to perform further
audit procedures, the auditor should obtain audit evidence about the accuracy and
completeness of the information.  In order for the auditor to obtain reliable audit
evidence, the information upon which the audit procedures are based needs to be
sufficiently complete and accurate.  For example, in auditing revenue by applying
standard prices to records of sales volume, the auditor should consider the
accuracy of the price information and the completeness and accuracy of the sales
volume data.  Obtaining audit evidence about the completeness and accuracy of
the information produced by the entity's information system may be performed
concurrently with the actual audit procedure applied to the information when
obtaining such audit evidence is an integral part of the audit procedure itself.

187.    All of the foregoing reflects the types of information that the Auditor Defendants

should have obtained and the manner in which it should have been obtained.  Plaintiffs here

allege, however, that the Auditor Defendants vacated any such responsibility in their audits of

Longwei for the relevant timeframe and failed, therefore, to obtain competent evidential matter

sufficient to issue an unqualified opinion.  This failure stemmed both from the shortcomings of

the Auditor Defendants and what Plaintiffs believe was a lack of any such information from

Longwei or other third parties in the absence of a truly functioning business operation.

**C.    Defendants' Internal Control Violations And Misrepresentations**

188.    Throughout the Class Period, the Company lacked adequate and effective

internal controls, particularly "disclosure controls and procedures" and "internal control over

financial reporting," despite Defendants' certifications and other statements to the contrary.

189.    The Exchange Act and the Foreign Corrupt Practices Act of 1977 require

publicly-traded companies, such as Longwei, and particularly the management of such

companies, to:  (a) make and keep books, records, and accounts which accurately and fairly

80

reflect the transactions and dispositions of the assets of the company; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in accordance with GAAP. 15 U.S.C. § 78m(b)(2); Section 110.03 of the AICPA Auditing Standards.

190.    More specifically, the Exchange Act requires publicly-traded companies to maintain "disclosure controls and procedures" and "internal control over financial reporting." 17 C.F.R. § 240.13a-15 and §240.15d-15.  The SEC defines "disclosure controls and procedures" as:

> …controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act…is recorded, processed, summarized and reported, within the time periods specified in the [SEC's] rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the [Exchange] Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. 17 C.F.R. § 240.13a-15(e) and §240.15d-15(e).

191.    The SEC defines "internal control over financial reporting" as:

> [A] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> 1. Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> 2. Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally

accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

3. Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

17 C.F.R. § 240.13a-15(f) and § 240.15d-15(f).

192.    The Exchange Act requires a company's management, including its principal executive and financial officers, to evaluate:  (a) the effectiveness of the company's (i) disclosure controls and procedures as of the end of each fiscal quarter, and (ii) internal control over financial reporting as of the end of each fiscal year; and (b) any change in the company's internal control over financial reporting that occurred during each fiscal quarter that materially affected, or was reasonably likely to materially affect, its internal control over financial reporting. 17 C.F.R. § 240.13a-15(d) and § 240.15d-15(d).

193.    SEC Regulation S-K requires publicly-traded companies to disclose, in their quarterly and annual financial statements, the results of such evaluations made by their principal executive and financial officers, 17 C.F.R. § 229.307, as well as any changes in the company's internal control over financial reporting. 17 C.F.R. § 229.308.

194.    Additionally, Sections 302 and 906 of SOX require a company's principal executive and financial officers to provide certifications attesting to, among other things: (a) the company's compliance with the Exchange Act, (b) the fair presentation of the company's financial statements, and (c) their responsibility for establishing, maintaining, and evaluating and disclosing the effectiveness of the company's disclosure controls and procedures and internal control over financial reporting.  Such certifications must accompany each quarterly

and annual financial statement filed by the company with the SEC (i.e., as exhibits to its Forms 10-Q and 10-K).

195.     Throughout the Class Period, Longwei disclosed in each of its Forms 10-K that the Company's management was responsible for the fair presentation of Longwei's financial statements and that the Company's internal controls were effective.  Specifically, as alleged above, Longwei claimed, and its CEO Defendant Cai and CFO Defendant Toups certified, that the Company's disclosure and control procedures were effective, except as noted with regards to the 2011 Form 10-K as set forth in ¶¶ 99–101.

196.     Similarly, Longwei disclosed in its Relevant Annual Financial Statements and related Forms 10-K for fiscal years 2010 and 2012 that its CEO Defendant Cai and CFO Defendant Toups concluded that the Company's internal control over financial reporting was effective.  As alleged above, Longwei's 2010 Form 10-K included a report by the Company's management on Longwei's internal control over financial reporting, which (a) acknowledged that Longwei's management is responsible for establishing and maintaining the Company's internal control over financial reporting and (b) communicated management's conclusion that the Company's internal control over financial reporting was effective.

197.     As set forth in ¶ 99, preceding, Longwei's 2011 Form 10-K admitted that that the Company's internal controls "were not effective to ensure that information required to be disclosed by us in our periodic reports is recorded, processed, summarized and reported, within the time periods specified for each report and that such information is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure."  Defendants, however, claimed this lack of internal controls only

required "several audit adjustments to our consolidated financial statements, principally

including the timely transfer of completed construction projects to property, plant and

equipment, which has resulted in an adjustment to depreciation, as well as reclassification of

inter-company payables and an increase of accrual for employees salary and related expenses."

The 2011 Form 10-K did not disclose the lack of internal controls over the reporting of sales,

related party transactions, and off balance sheet transactions which plagued the Company and

therefore rendered the reported financial results false and misleading throughout the Class

Period.

198.    Also as alleged above, Defendants Cai and Toups provided signed certifications

pursuant to Sections 302 and 906 of SOX, attesting to, among other things:  (a) Longwei's

compliance with the Exchange Act, (b) the fair presentation of the Company's financial

statements, and (c) their responsibility for establishing, maintaining, evaluating and disclosing

the effectiveness of the Longwei's disclosure controls, procedures, and internal control over

financial reporting.

199.    However, each of the aforementioned disclosures and certifications made by the

Defendants were materially false and misleading since the Company's internal controls were

not effective, and "material weaknesses" existed in the design and operation of the Company's

disclosure controls and procedures and internal control over financial reporting.  These

weaknesses in internal controls permitted the Company to report overstated earnings and fail to

disclose the related party investment by Zhonghe and Defendant Cai in Jinriyue Tourism.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    All Defendants

200.    Defendants acted with scienter because they: (i) knew and/or recklessly

disregarded that the public statements issued or disseminated by Defendants were materially

false and misleading; (ii) knew and/or recklessly disregarded that such statements would be issued or disseminated to the investing public; and (iii) knowingly and/or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

201.    Defendants knew, or recklessly disregarded, that the Taiyuan, Gujiao, and Huajie Facilities did not generate the sales or revenues of petroleum Products represented throughout the Class Period.  As repeatedly noted by Defendant Toups, the Company's headquarters are located at the Taiyuan Facility and the fueling operations are clearly visible from the Company headquarters.  Throughout the Class Period, sales of petroleum Products from the Taiyuan Facility accounted for approximately 50% of the Company's total revenues.  Moreover, throughout the Class Period, the sales and revenues of petroleum Products from all three Facilities represented over 90% of the Company's total revenues.

202.    Throughout the Class Period, Defendants claimed to have real-time access to actual inventory and sales of Products from its three storage Facilities.  As explicitly set forth in the Company's Form 10-K filings, Longwei employed its own ERP computer system, which managed and monitored the inflow and outflow of the Products at the three fuel storage locations.  According to the Company, the ERP system fed directly into the Company's inventory accounting system in order to monitor and manage inventory levels and automatically updated on a real-time basis.  Defendant Toups further reinforced these statements with regard to the ERP system in conference calls on November 17, 2010, February 15, 2011, and May 19, 2011, in which he stated:

> *We operate with an ERP system, which is an enterprise resource planning system, that automatically measures the flow and outflow of all product in and out of our inventory, which ties directly into our accounting system.*

203.    Defendants knew or recklessly disregarded the fact that even though all petroleum wholesalers in the PRC are subject to the same regulations, Longwei was the only company in the PRC petroleum industry that was able to report record sales and revenues every quarter during the Class Period, regardless of the fluctuation in crude oil prices.  For example, in the third calendar quarter ending September 30, 2011 (Longwei's first fiscal quarter of 2012), competitor Sinopec Shanghai Petrochemical Company Limited ("Sinopec") reported a decline of 8% in basic earnings from RMB 1.792 billion in 2010 to RMB 1.652 billion in 2012, which was attributed to fluctuations in international crude oil prices "resulting in an increase in operating costs; the prices of domestic refined oil products were not adjusted adequately and timely enough; and competition was further intensified for petrochemicals."  During this same period of fluctuating oil prices, Longwei was able to report a 40% increase in revenues and a 44% increase in adjusted net income.

204.    Defendants also knew or recklessly disregarded that Longwei's Zhonghe subsidiary had entered into a $32 million investment with a related party that was not recorded on the Company's balance sheet with regards to the Shengjing project and committed the Company to an additional investment of $222 million for the completion of the project.  In fact, if Defendants had properly evaluated filings in the PRC, Defendants would have discovered Zhonghe's investment in, and commitment to, the tourism project with Defendant Cai, and that Cai was the "face" of the project.

205.    Defendants further knew that maintaining adequate internal controls over financial reporting was particularly difficult and required a greater degree of scrutiny in companies like Longwei whose major operations were located in China, since the books and records of Longwei's Chinese subsidiaries were not maintained in accordance with U.S. GAAP,

but in accordance with the differing provisions of PRC GAAP, and which then must be converted to comply with U.S. GAAP.

206.     Throughout the Class Period, Defendants Cai and Xue dominated and controlled the Company and its Board, and the remaining Defendants were little more than a rubber stamp for the decisions of Cai and Xue.  When Longwei completed the CRM in which the Company became a public registered company in the U.S. in 2007, Cai and Xue each owned 46% of the outstanding shares of the Company and were the only two members of the Company's Board. As the only members of the Board, Cai and Xue selected, approved, and appointed Defendant CvWB, the predecessor in interest to Anderson & Bradshaw, to serve as the Company's auditors.  On March 22, 2010, as the only members of the Board, Cai and Xue also selected and appointed Defendants DeCiccio, Cole, and non-defendant Xiaoping to serve as purportedly independent directors, and the only members of the Board's Audit, Compensation, and Nominating Committees.  Defendants Cai and Xue's domination of the Company is further demonstrated by the fact that Longwei has reported in its Proxy Statements that ***there has never been a meeting of the Board and that all actions have been taken by the acquiescence of the independent directors to actions by written consent***.  Moreover, the Company never held an annual meeting of shareholders to elect the directors or approve the auditors until December 15, 2011.

207.     On October 29, 2009, prior to the Class Period, the Company conducted the October 2009 Financing, set forth in ¶¶ 5, 68–69, whereby Longwei sold 13,499,274 units consisting collectively of (i) 13,499,274 shares of Series A Preferred Stock and (ii) Warrants to purchase an additional 13,499,274 shares of common stock at an exercise price of $2.255 per share with a three-year term.  Longwei received only $12,381,281 in net proceeds from this