**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                        :
                                        :   C.A.  No.  1:13-cv-00214-HB
                                        :
                                        :   CLASS  ACTION
In re: LONGWEI PETROLEUM         :
INVESTMENT HOLDING LIMITED    :   JURY  TRIAL  DEMANDED
SECURITIES LITIGATION            :
                                        :
                                        :
                                        :
                                        :
------------------------------------------------------- X
This Document Relates To: All Actions

# CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

# PART IV

offering.  However, if all of the warrants were exercised, the Company would have received an

additional $30,440,862.  Therefore, Defendants had an incentive and motivation to maintain a

stock price above $2.255 throughout the Class Period.  On October 24, 2012, the last trading

day before the warrants were scheduled to expire, Longwei common stock closed at $2.24.

Therefore, the Company unilaterally announced a 30-day extension of the period in which the

warrants could be exercised.  In that 30-day period, Longwei issued a series of press releases,

particularly with regards to the Huajie Facility, including the commencement of operations and

purported agreements signed with customers, in an attempt to drive the price above $2.255 in

hopes investors would exercise the outstanding warrants.

### B.    Officer Defendants

208.    Defendants Cai and Toups exercised hands-on management and control of

Longwei throughout the Class Period.  Because the Company's headquarters are located at the

Taiyuan Facility and the fueling operations are clearly visible from the Company headquarters,

Defendants Cai and Toups had knowledge that the quantity of sales and revenues from fuel

Products from the Taiyuan Facility were not as represented to investors.

209.    Moreover, Defendant Toups, by simply looking out of the Taiyuan office

windows at the idled tanker fueling station next door, should have easily detected and prevented

LPH's brazen fraud given the amount of time he claims to spend at the facility.  Specifically,

during the May 2011 Promotional Video, Defendant Toups stated that he had "spent a

considerable amount of time here in Taiyuan City working with the company, working with the

management. I've really rolled up my sleeves in terms of understanding the financials…"  On a

September 14, 2011 investor conference call, Defendant Toups stated that he was "***was very***

***comfortable with the company in terms of the first year track record with the company,***

***working with Mr. Cai, working with Ms. Xue, in terms of our management team, in terms of***

*our financial controls,* where we're going and what we're trying to do."  Defendant Toups

went on to state that:

> I personally had to take a good look at the company and make sure that I was with the right company, I was with the right people.  *And I am personally very comfortable with Mr. Cai, with his ability not only to operate the business, but with his ability in terms of visibility for the company and his concern for his shareholders.  So, I was comfortable with the company as I reupped… again, my contract was renewed in August, so I was very comfortable signing back up with the company.*  As I think everyone well knows, being the lone American, US officer, *there's a lot of reliability as well as responsibility on me to be able to make sure that our numbers are good, that we report well, that we have full transparency and that have full internal controls, and working through the Sarbanes Oxley compliance, that as I re-up, I made darn sure that this company was where we needed to be overall.  So, I feel very comfortable with where the company is*.  I'm very comfortable with my working relationship with Mr. Cai and with the management team and with the accounting staff that we have on the ground.

210.   On the November 14, 2012 investor conference call, Defendant Toups once

again proclaimed his close familiarity with Longwei's operational structure, stating "[a]t this

point I consider myself 100% full time CFO of Longwei.  *As my wife reminded me, I actually*

*just got back to the US on Friday after we finished up the quarterly numbers and got that*

*wrapped but, out of the last six months, I've been in the US for three weeks*. So in terms of

full-time commitment, I would say I am already there."

211.   Additionally, Defendants Cai and Xue each sold 1,000,000 shares of their

personal holdings of unregistered Longwei common stock on or about November 9, 2010.  The

timing and amount of these sales was highly unusual.  This was the first time that either

Defendants Cai or Xue ever sold any of their holdings of Longwei stock.  Moreover, this sale

came days after Longwei common stock reached a Class Period high.  While these sales of

unregistered stock were conducted as a private placement below market price, Defendants Cai

and Xue could not have consummated the transaction or received the proceeds they did if

Longwei had not just reported record financial results in the 2010 Form 10-K. Moreover, the market reacted sharply to the report of the sale, which made it necessary for Defendant Toups to answer questions from shareholders regarding this transaction in a conference call on February 15, 2011, in which he stated:

> One other question that has been addressed was, there was a sale of 2 million shares by—a million shares each by—two of the principals in the company, two of the primary large shareholders. Between the two shareholders, they had 69 million shares. Last quarter, each of them sold one million shares. It was a private transaction that had been negotiated some months prior, so the value was somewhat below the current stock price. Again, this was restricted stock that had been sold. So, this was a private transaction, restricted stock, on something that had been previously negotiated some time ago.

### C.    Audit Committee Defendants

212.    Throughout the Class Period, Defendants Cai and Xue dominated and controlled the Audit Committee, which essentially served as a rubber stamp for the decisions of Cai and Xue. When Longwei completed the CRM in which the Company became a public registered company in the U.S. in 2007, Defendants Cai and Xue each owned 46% of the outstanding shares of the Company and were the only two members of the Company's Board. As the only members of the Board, Cai and Xue selected, approved, and appointed Defendants DeCiccio, Cole, and non-defendant Xiaoping to serve as purportedly independent directors, and the only members of the Board's Audit Committees. Then, when Defendant DeCiccio did not stand for reelection at the December 15, 2011 shareholders' meeting, Defendants Cai and Xue, by virtue of their shareholdings, elected Defendant Dong to the Board, resulting in her appointment to the Audit Committee. Moreover, no Board meetings were ever held and the Audit Committee never reported a single meeting. Further, even though Defendant CvWB was selected as the Company's auditor by Defendants Cai and Xue, the Audit Committee recommended their retention each year.

213.   Audit Committee members DeCiccio, Cole, and Dong have unique knowledge of the increased scrutiny that should be applied to financial reporting of public companies, particularly with regards to transactions involving significant subsidiaries of companies that have conducted a CRM.  Defendant DeCiccio is a certified public accountant and the former CFO of a publicly traded company, Defendant Cole is a former chief accounting officer for a publicly traded company, and Defendant Dong served as CFO of the Silicon Valley Chinese American Computer and Commerce Association.  As a result, Defendants DeCiccio, Cole, and Dong have specialized knowledge with regards to such matters.  Further, Defendants DeCiccio, Cole, and Dong each served as a director and member of the audit committees for other CRM companies which gave them prior experience with regards to accounting issues confronting CRM companies.

214.   Furthermore, Defendants DeCiccio and Dong were directors and members of the audit committee of WEM, which shared history, auditors, and accounting irregularities with Longwei.  Longwei became a publicly traded company by engaging in a CRM with Tabatha II, Inc., which at the time was owned by John Ballard and Diane Thelen.  WEM became a publicly traded company by engaging in a CRM with Tabatha III, Inc. also owned at the time by Ballard and Thelen.  Both Longwei and WEM at the time were audited by CvWB.  Defendant DeCiccio was a director and audit committee member of WEM from January 1, 2009 to February 18, 2010, and CFO and chief accounting officer of WEM from February 18, 2010 to February 18, 2011, when he was replaced by as CFO by Defendant Toups.  Defendant Dong was a director and audit committee member of WEM from July 2010 to June 2011.  On July 30, 2011, WEM announced that its financial statements for the quarters ended June 30, 2010 and September 30, 2010 could no longer be relied upon as they improperly reported WEM owned 99.9% of its

Nantong subsidiary, when in fact effective April 28, 2010, WEM's ownership of Nantong was reduced to 51%. Thereafter, WEM was incapable of filing the required restatement and the registration of WEM's securities was revoked by the SEC on May 16, 2012. By virtue of their experience at WEM, Defendants DeCiccio and Dong had additional knowledge regarding transactions involving CRM companies.

**D.      Auditor Defendants**

215.   The Auditor Defendants acted with scienter because they: (i) knew and/or recklessly disregarded that the public statements issued or disseminated by Defendants in the name of the Auditor Defendants regarding the Company were materially false and misleading; (ii) knew and/or recklessly disregarded that such statements would be issued or disseminated to the investing public; and (iii) knowingly and/or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

216.   The Auditor Defendants knew and/or recklessly disregarded that the Taiyuan, Gujiao, and Huajie Facilities did not generate the sales or revenues of petroleum Products represented throughout the Class Period. The Auditor Defendants further knew and/or recklessly disregarded that the Company engaged in multiple undisclosed related party transactions with Defendant Cai and entities in which Cai either held an ownership interest or had entangling business relationships. As the auditor of a publicly traded company, the Auditor Defendants were required under GAAS to perform its audits of the Company's financial statements during the Class Period in accordance with applicable professional standards and, specifically, with a proper degree of professional skepticism.

217.   In the process of conducting the review of quarterly financial statements and audit of Longwei's annual financial statements, Defendants had access to all evidence,

transactional documents, and filings in the PRC, including SAIC and SAT filings, which if evaluated with the proper degree of professional due care and/or professional skepticism would have revealed that the Company was overstating sales and revenues and failing to disclose related party and investments not recorded on the Company's balance sheet.  Instead, the Auditor Defendant's failure to do so much as ensure that actual operations were occurring at Longwei's primary plants left its audits for the relevant timeframe woefully insufficient and in violation of GAAS, as well as its audit opinions pertaining to the fiscal years in the relevant timeframe false and misleading.

218.    In fact, the Auditor Defendants were intimately familiar with Longwei's operations and financial conditions (or at least should have been), according to the Officer Defendants.  For example, during the February 15, 2011 investor conference call, Defendant Toups stated that "***with Child Van Wagoner, management has assessed that and is very comfortable with the job that Child Van Wagoner has done for our firm.  The audit partners there have more than ten years' experience at a Big Four accounting firm.  We've got Chinese auditors on the ground in China, US auditors that come over to China as part of that audit equation.***"  On the November 10, 2011 investor conference call, Defendant Toups again reiterated his confidence in Child Van Wagoner, stating that "***[w]e've moved forward with Child Van Wagoner.  They're obviously very familiar and have been out to visit the assets being acquired, and all that***."  Moreover, with regards to the SEC-SAIC reconciliation, Toups claimed that, "[w]e had initially pulled the reports, ***but on the advice of our auditors, they wanted to go pull the reports themselves, go to the agency to pull the report***.  So, it's really just become a timing function for them to pull that, but they are starting to pull numbers together and it is something that is in the works."

219.    Additionally, during the November 14, 2012 investor conference call, Defendant

Toups continued to express confidence in the Auditor Defendants, stating:

> *They send their US based team, they also have an office out of Hong Kong that they service that worth but send the US team to come in at least once a year often times, two or three times a year to meet the company to meet with Cai and again, dealing directly with our audit committee on a yearend audit.*
>
> *They do and certainly they follow all the GAAP procedures would be the independent audit verification. So they verify our accounts receivable, they verify our advances to suppliers, certainly verify all of our licenses, our asset transfers. So all of that again, they have to have completed because they in turn are then audited and inspected by the PCOB who comes in and looks through their books. Obviously with the Chinese company, they really look at it under a microscope based on some of the other circumstances within the space but we feel like we've had a good inspection and again, I try to be as transparent as possible with all of our activities.*

                    *                    *                    *

> Obviously with the yearend audit is when they'll do some of their larger audit procedures, but they (inaudible) two or three times a year. So they'll come and they check certain things certainly with the acquisition. *They were very involved with us on that in terms of looking at their appraisals, doing the physical inspections, working with those in terms of the deposits that we had on hand interview the seller. So I mean it was a fairly detailed procedures that they went through certainly at the year and now that we've got this acquisition wrapped up.*

220.    According to reports from the PCAOB, the Auditor Defendants have a history of

audit deficiencies.  Specifically, a January 30, 2009 PCAOB report found deficiencies in four of

the audits examined to be "of such significance that it appeared to the inspection team that the

Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's

financial statements."   Moreover, the PCAOB further found that the Auditor Defendants'

"system of quality control appears not to do enough to ensure technical competence and the

exercise of due care or professional skepticism."  Then in a PCAOB report issued one year later

on July 2, 2010, the PCAOB found eight of the audits examined deficient.  Notably, this report

found the Auditor Defendants  failed "to perform sufficient procedures regarding related party

transactions," failed "on five audits, to perform sufficient procedures related to reverse mergers

and other business combinations," and failed "to perform sufficient procedures related to

revenue[.]"  In other words, the PCAOB reports demonstrate that the Auditor Defendants have a

history of failing to identify exactly the accounting irregularities alleged herein.  By failing to

implement sufficient procedures regarding related party transactions, reverse mergers, and

revenues – even after such deficiencies had been identified by the PCAOB – the Auditor

Defendants demonstrated a deliberate indifference to the truth and their audit of Longwei was

so deficient that it amounted to no audit at all.

221.    The Auditor Defendants also have a history of providing unqualified audit

opinions for other CRM companies engaged in financial manipulation of their reported results.

For example, the Auditor Defendants issued the audit opinion for Longwei's initial registration

of securities in 2007.  The Auditor Defendants also served as the auditors for numerous other

CRM companies such as WEM and Yuhe International. Inc. ("Yuhe"), which issued false and

misleading financial statements audited by the Auditor Defendants, that ultimately led to the

delisting or revocation of registration of their securities.  As set forth above, while the Auditor

Defendants served as WEM's auditors, WEM was forced to announce that its financial

statements for the quarters ended June 30, 2010 and September 30, 2010 could no longer be

relied upon as they improperly reported WEM owned 99.9% of its Nantong subsidiary, when in

fact effective April 28, 2010, WEM's ownership of Nantong was reduced to 51%.  Thereafter,

WEM was incapable of filing the required restatement and the SEC revoked WEM's securities

registration on May 16, 2012.  Similarly, Yuhe engaged in related party transactions and made

misrepresentations to investors regarding these transactions while the Auditor Defendants

served as its auditor.  Ultimately, the audited financial results were withdrawn and the
company's stock was delisted by NASDAQ.  By virtue of their experience at WEM and Yuhe,
the Auditor Defendants had practical, hands-on knowledge that transactions involving CRM
companies should be subject to more rigorous scrutiny.

### E.    Red Flags

222.    There were numerous red flags which warned the Auditor Defendants and the
Audit Committee Defendants of the possibility that Longwei's financial results were overstated,
that the Company lacked adequate internal controls over financial reporting, and that the Annual
Reports on Forms 10-K for 2010, 2011, and 2012 did not report all investments or related party
transactions.  These red flags include the following:

    a.   Longwei's Board of Directors did not hold a single meeting during the
Class Period, but took all actions by written consent;

    b.   Longwei's Audit Committee did not report a single meeting during the
Class Period;

    c.   The Auditor Defendants had longstanding ties to other failed and
fraudulent CRM companies;

    d.   The Auditor Defendants had a history of performing audits of CRM
companies found deficient by the PCAOB;

    e.   The Audit Committee members had longstanding ties with other failed and
fraudulent CRM companies, the Auditor Defendants, and RedChip, a
major promoter of the Company;

    f.   Defendant Toups simultaneously held the position of CFO at Longwei,
China Bilingual, and WEM (other clients of the Auditor Defendants
and/or RedChip) and was therefore unable to devote his full time and
attention to the financial performance of Longwei.  In a conference call on
May 19, 2011, when Defendant Toups was only serving as CFO for
Longwei and China Bilingual, one conference call participant questioned:
"So this next question… it has nothing to do with you personally, it's just
the position itself.   Because of the growth and because of the projections
for LPH, is LPH considering hiring a full-time CFO, whether that's
yourself or someone else?"

g. Despite the fact that Longwei operated in an industry with strict regulations on both the purchase and sale price of petroleum products, Longwei was the only company in the industry that was able to report record financial results each quarter during the Class Period;

h. To achieve the net income after taxes required under the Make Good Escrow Agreement, Longwei reported an increase of $38.97 million—a stunning 52% increase in the deposits to suppliers which it carried as an asset on its balance sheet for 2010 as compared to 2009.  The increase in this asset is equal to more than 95% of the net income after taxes reported in the 2010 Form 10-K;

i. Longwei reported assets on its balance sheet that as a percentage of its sales far exceeded those of competitors in the industry.

   a) For example, throughout the Class Period, Longwei reported deposits to suppliers as an asset on its balance sheet that far exceeded those recorded by competitors in the industry.  As demonstrated by the following chart, the deposits recorded by Longwei were twenty times greater than competitor PetroChina Company Limited ("PetroChina") and hundreds of times greater than Sinopec:

| Deposits (as % of sales) | 2010 | 2011 | 2012 |
|---|---|---|---|
| Longwei | 21.64% | 11.99% | 21.51% |
| Sinopec | 0.0014% | 0.0017% | 0.0016% |
| PetroChina | 2.55% | 1.89% | 1.49% |

   b) As another example, throughout the Class Period, Longwei reported accounts receivable as an asset on its balance sheet that was nearly double that reported by competitors in the industry.  As demonstrated by the following charts, however, Longwei was the only company in the industry that did not record any charges whatsoever for doubtful accounts:

| Accounts Receivable (% sales) | 2010 | 2011 | 2012 |
|---|---|---|---|
| Longwei | 7.52% | 4.96% | 6.64% |
| Sinopec | 3.66% | 3.92% | 3.4% |
| PetroChina | 3.07% | 2.72% | 2.96% |

| Doubtful Accounts | 2010 | 2011 | 2012 |
|---|---|---|---|
| Longwei | 0.00 | 0.00 | 0.00 |
| Sinopec | 12,634,000 | 7,837,000 | 882,000 |
| PetroChina | 1,052,000 | 585,000 | 850,000 |

j.  There were numerous questions with regards to transactions reported in the Annual Reports on Form 10-K filed during the Class Period.  For example, the 2010 Form 10-K reported that Longwei signed a letter of intent to purchase the assets at the Guajie Facility for $17 million, but instead paid $30 million when a dormant company with no operations was included in the transaction.

k.  As revealed in the *GeoInvesting* Report, the revenues reported for, and taxes paid by, various operating subsidiaries in the SAIC records and filings did not match the revenues and taxes reported for the same subsidiaries in Longwei's Annual Reports on Form 10-K filed during the Class Period, despite the reported SAIC and SEC reconciliation reported during the Class Period.

## X.   CLASS ACTION ALLEGATIONS

223.    Lead Plaintiffs bring this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class (the "Class") consisting of all persons and entities that purchased or otherwise acquired Longwei common stock in the United States or on the NYSE during the Class Period at artificially inflated prices and who suffered damages as a result.  Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

224.    Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  As of June 30, 2012, Longwei had more than 100,751,966 shares of common stock outstanding, beneficially owned by hundreds, if not thousands, of

persons.  Throughout the Class Period, Longwei common shares were actively traded on the

NYSE stock market.  While the exact number of Class members remains unknown to the Lead

Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead

Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

Additionally, record owners and Class Members may be identified from records maintained by

Longwei, or its transfer agent, and may be notified of the pendency of this action by mail and

publication, using forms of notice similar to those customarily used in securities class actions.

225.    Lead Plaintiffs' claims are typical of the other members of the Class because

Plaintiffs and all of the Class members sustained damages that arose out of the Defendants'

unlawful conduct complained of herein.

226.    Lead Plaintiffs will fairly and adequately protect the interests of the members of

the Class, and Lead Plaintiffs have no interests that are contrary to, or in conflict with, the

interests of the Class members that they seek to represent.  Lead Plaintiffs have retained

competent counsel experienced in class action litigation under the federal securities laws to

ensure such protection and intends to prosecute this action vigorously.

227.    The prosecution of separate actions by individual Class members would create a

risk of inconsistent and varying adjudications, which could establish incompatible standards of

conduct for Defendants.  Questions of law and fact common to members of the Class

predominate over any questions that may affect only individual members, in that Defendants

have acted on grounds generally applicable to the entire Class.  The questions of law and fact

common to the Class include, but are not limited to, the following:

     a.    whether Defendants' acts violated the federal securities laws as alleged
         herein;

     b.    whether Defendants' publicly disseminated statements during the Class
         Period omitted and/or misrepresented material facts;

c.    whether Defendants acted with scienter in omitting and/or misrepresenting material facts;

d.    whether the price of Longwei securities were artificially inflated during the Class Period as a result of the material misrepresentations and omissions complained of herein;

e.    whether the Individual Defendants were controlling person as alleged herein; and

f.    whether members of the Class have sustained damages and, if so, the proper measure of such damages.

228.    A class action is superior to other methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually seek redress for wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    GROUP PLEADING

229.    The Individual Defendants are also liable for the materially false and misleading statements and omissions of material fact in Longwei's SEC filings, press releases, and other public statements, as such statements represent "group-published" information disseminated to the public as a result of the collective actions of the Individual Defendants.  It is appropriate to treat the Individual Defendants as a group and to presume that the false and misleading information conveyed in the public filings, press releases, and other publications, as alleged herein, are the collective actions of the narrowly defined group of Individual Defendants identified herein.  The Individual Defendants, by virtue of their high level positions within Longwei, directly participated in the management of the Company, were directly involved with the day-to-day operations and were privy to confidential non-public information concerning

Longwei's business operations and finances.  The Individual Defendants were involved in drafting, reviewing and/or disseminating the materially false and misleading statements and omissions of material fact that were issued by Longwei, approved or ratified these statements and, therefore, adopted them as their own.

230.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Longwei, were privy to confidential and proprietary information concerning Longwei, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Longwei's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, and their direct involvement in the everyday business of Longwei, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

## XII.    LOSS CAUSATION

231.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Longwei's stock price and operated as a fraud or deceit on Class Period purchasers of Longwei stock by misrepresenting and omitting the Company's business and prospects.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of Longwei's financial results, internal controls, and operations.

232.    Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial and operational condition or to cause and direct that such information be disseminated, and to promptly correct any previously disseminated information that was materially misleading to the market. As a result of their failure to do so, the price of Longwei common stock was artificially inflated during the Class Period, directly causing Lead Plaintiffs and the Class to suffer damages when the truth eventually emerged.

233.    As the truth began to emerge regarding the true financial condition and lack of internal controls over financial reporting at Longwei on January 3, 2013, the price of Longwei stock declined as the market processed each set of previously undisclosed facts.  These disclosures removed a portion of the artificial inflation in the price of Longwei's common stock and directly caused Plaintiffs and other Class members to suffer damages. The dialing trading prices and volumes of Longwei stock are incorporated by reference herein.

234.    Until shortly before Lead Plaintiffs filed this action, they were unaware of the facts alleged herein and could not have reasonably discovered Defendants' misrepresentations and omissions by the exercise of reasonable diligence.

## XIII.   CONTROL PERSON LIABILITY

235.    The Individual Defendants are liable as direct participants with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and each had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Longwei's business.

236.     Specifically, because of their position within the Company, the Individual Defendants possessed the power and authority to control the contents of Longwei's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market, including those containing the materially false and misleading statements and omissions of material fact alleged herein.  Each of the Individual Defendants, by reason of his respective management or board position, had the ability and opportunity to review copies of the Company's SEC filings, reports and press releases alleged herein to be misleading, prior to, or shortly after their issuance or to cause them to be corrected.

237.     By virtue of their positions, the Individual Defendants had access to material non-public information.  Each of the Individual Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.

238.     In addition, Defendant Anderson, by reason of his status as the audit partner and contact person for the Auditor Defendants, was a "controlling person" of the Auditor Defendants within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Auditor Defendants to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendant Anderson was able to and did, directly or indirectly, control the conduct of the Auditor Defendants.

## XIV.   FRAUD-ON-THE-MARKET PRESUMPTION

239.     At all relevant times, the market for Longwei's publicly traded securities was an efficient market for the following reasons, among others:

a.       Longwei's common stock was listed and actively traded on the NYSE

103

(symbol LPH), a highly efficient national market;

b.    As a registered and regulated issuer of securities, Longwei filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c.    Longwei regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d.    The market reacted to public information disseminated by Longwei;

e.    Longwei was followed by multiple analysts, which followed Longwei's business and wrote reports which were publicly available and affected the public marketplace;

f.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Longwei's stock; and

g.    Without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased or otherwise acquired Longwei stock between the time the Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Longwei stock was artificially inflated by Defendants' misrepresentations and omissions.

240.    As a result of the above, the market for Longwei common stock promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the security's price.  Under these circumstances, all purchasers of Longwei common stock during the Class Period suffered similar injuries through their purchases of shares at prices which were artificially inflated by the Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## XV.   THE AFFILIATED UTE PRESUMPTION

241.    At all relevant times, Lead Plaintiffs and the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC

filings.  Lead Plaintiffs and the Class would not have purchased or otherwise acquired Longwei

common stock at artificially inflated prices if Defendants had disclosed all material information

as required.  Thus, to the extent Defendants wrongfully failed to disclose material information

concerning to the Company's nonexistent petroleum sales, related party investments, or

minority ownerships, or otherwise, Lead Plaintiffs are presumed to rely on Defendants'

omissions as established by the Supreme Court in *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128

(1972).

## XVI.  NO STATUTORY SAFE HARBOR

242.    As alleged herein, Defendants acted with scienter because, at the time that they

issued public documents and other statements in Longwei's name, they knew or recklessly

disregarded the fact that such statements were materially false and misleading or omitted

material fact.  Moreover, the Defendants knew that such documents and statements would be

issued or disseminated to the investing public; knew that persons were likely to rely upon those

misrepresentations and omissions; and knowingly and/or recklessly participated in the issuance

and/or dissemination of such statements and/or documents as primary violators of the federal

securities laws.

243.    As set forth in detail in the Complaint, the Individual Defendants, by virtue of

their control over, and/or receipt of Longwei's materially misleading statements and/or their

association with the Company which made them privy to confidential proprietary information

concerning Longwei which was used to artificially inflate financial results and which Individual

Defendants caused or were informed of, participated in and knew of the fraudulent scheme

alleged herein.  With respect to non-forward looking statements and/or omissions, the

Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of

that information, which they caused to be disseminated to the investing public.

244.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made and/or were statements of present and/or historical fact. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made.  Moreover, meaningful statements did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statement.

245.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Longwei who knew that those statements were false when made.  None of the historic or present tense statements made by Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XVII.  CAUSES OF ACTION

## COUNT I

### For Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against Longwei, the Individual Defendants, and the Auditor Defendants

246.   Lead Plaintiffs reallege each allegation above as if fully set forth herein.

247.   This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against

Longwei, the Individual Defendants, and the Auditor Defendants.  Defendants (1) employed

devices, schemes and artifices to defraud; (2) made untrue statements of material fact and/or

omitted material facts necessary to make the statements made not misleading; and (3) engaged

in acts, practices and a course of business which operated as a fraud and deceit upon Lead

Plaintiffs and the Class, in violation of Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder.

248.   Defendants, individually and in concert, directly and indirectly, by the use,

means or instrumentalities of interstate commerce and/or the mails, engaged and participated in

a continuous course of conduct to conceal non-public, adverse material information about the

Company's financial condition as reflected in the misrepresentations and omissions set forth

above.

249.   Defendants each had actual knowledge of the misrepresentations and omissions

of material facts set forth herein, or acted with reckless disregard for the truth by failing to

ascertain and to disclose such facts even though such facts were available to them, or

deliberately refrained from taking steps necessary to discover whether the material facts were

false or misleading.  As a result of Defendants' dissemination of materially false and misleading

information and their failure to disclose material facts, Lead Plaintiffs and the Class were

misled into believing that the Company's statements and other disclosures were true, accurate and complete.

250.    Longwei is liable for the acts of the Individual Defendants under the doctrine of respondeat superior, as the Individual Defendants were acting as the officers, directors and/or agents of Longwei in taking the actions alleged herein.

251.    Lead Plaintiffs and the Class purchased Longwei securities, without knowing that Defendants had misstated or omitted material facts about the Company's financial performance or prospects. In so doing, Lead Plaintiffs and the Class relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements. Lead Plaintiffs and the Class were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

252.    At the time of Defendants' false statements, misrepresentations and omissions, Lead Plaintiffs and the Class were unaware of their falsity and believed them to be true. Lead Plaintiffs and the Class would not otherwise have purchased Longwei securities had they known the truth about the matters discussed above.

253.    Lead Plaintiffs are filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Lead Plaintiffs' claim, and within five years after the violations with respect to Lead Plaintiffs' investments.

254.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

255.   As a direct and proximate result of Defendants' wrongful conduct, Lead

Plaintiffs and the Class have suffered damages in connection with their purchase of Longwei

securities.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants and Russell Anderson**

256.   Lead Plaintiffs reallege each allegation above as if fully set forth herein.

257.   Each of the Individual Defendants, by reason of their status as senior executive

officers and directors of Longwei, directly or indirectly, controlled the conduct of the

Company's business and its representations to Lead Plaintiffs and the Class, within the meaning

of §20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the

content of the Company's SEC statements and press releases related to Lead Plaintiffs' and the

Class' investments in Longwei securities within the meaning of §20(a) of the Exchange Act.

Similarly, Defendant Anderson directly or indirectly controlled the content of the Auditor

Defendants' SEC statements and audit opinions related to Lead Plaintiffs' and the Class'

investments in Longwei securities within the meaning of §20(a) of the Exchange Act.

Therefore, the Individual Defendants and Defendant Anderson are jointly and severally liable

for the Company's fraud, as alleged herein.

258.   The Individual Defendants and Anderson controlled and had the authority to

control the content of the Company's SEC statements and press releases, and the Auditor

Defendants' statements, respectively. Because of their close involvement in the everyday

activities of the Company and the Auditor Defendants, and because of their wide-ranging

supervisory authority, the Individual Defendants and Anderson reviewed or had the opportunity

to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

259.    The Individual Defendants and Anderson knew or recklessly disregarded the fact that Longwei's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants and Anderson did not act in good faith.

260.    By virtue of their high-level positions and their participation in and awareness of Longwei's operations and public statements, the Individual Defendants were able to and did influence and control Longwei's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiffs and the Class contend contained materially false and misleading information and on which Lead Plaintiffs and the Class relied.

261.    Similarly, by virtue of his positions and their participation in and awareness of the Auditor Defendants conduct and public statements, the Defendant Anderson was able to and did influence and control the Auditor Defendant's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiffs and the Class contend contained materially false and misleading information and on which Lead Plaintiffs and the Class relied.

262.    The Individual Defendants and Anderson had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

263.    As set forth above, Longwei, the Individual Defendants, and the Auditor Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants and Anderson are also liable pursuant to §20(a) of the Exchange Act.

264.    As a direct and proximate result of the Individual Defendants' and Anderson's wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchase of Longwei securities.

## XVIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs on behalf of themselves and the Class, pray for relief and judgment including:

A.    Determining that Counts I and II of this action is a proper class action under Federal Rules of Civil Procedure 23, certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including, but not limited to, rescission);

D.    Awarding Lead Plaintiffs and the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E.    Awarding such other and further relief as may be just and proper.

## XIX.   JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury on all triable claims.

Dated:  New York, New York
      July 8, 2013

**FARUQI & FARUQI, LLP**

Richard W. Gonnello
Francis P. McConville
369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: (212) 983-9330
Fax: (212) 983-9331
E-mail: rgonnello@faruqilaw.com
          fmcconville@faruqilaw.com

*Counsel For Lead Plaintiffs*

112

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2013, I caused a true and correct copy of the foregoing

CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT to be served upon all defense

counsel listed below via First Class Mail, postage pre-paid and via Electronic Mail:

Gary Anthony Varnavides
Sichenzia Ross Friedman Ference LLP
61 Broadway
New York, NY 10006
(212) 930-9700
Fax: (212) 930-9725
gvarnavides@srff.com

By: _____

# EXHIBIT A

Seeking Alpha $^{\alpha}$

# Longwei Petroleum: The Most Brazen China-Based U.S. Listed RTO To Date

Jan 3 2013, 09:55
by: The GeoTeam

| about: LPH, includes: CBEH.PK, LTUS.OB, NEWN, ORSX.PK, PUDA.OB, SBAY.PK, SCEI, YUII.PK

**Disclosure:** I am short LPH. **(More...)**

Since 2010, Geoinvesting.com has helped investors navigate the U.S. Listed Chinese company universe (ChinaHybrids) that has proven to be full of companies actively engaged in deceiving investors. As investors read our exposé on Longwei Petroleum Investment Holding Limited (LPH) today they need to realize that our due diligence process employed similar tools, such as video surveillance of operations, recorded interviews, and SAIC filing analysis that directly led to the halt and eventual delisting of numerous ChinaHybrids. Our exposure of the fraud perpetrated by Puda Coal (PUDA.OB) and Yuhe (YUII.PK) was ground breaking in that both managements actually admitted their deceit. Likewise, Alfred Little's report on China Integrated Energy (CBEH.PK) was the first to use video surveillance to prove fraud. Today's report on LPH combines these approaches and allows us to make our strongest conclusion of fraud to date. The choice investors are left to make is very simple: Do I hold onto LPH and wait for the rhetoric that its management and its fee collectors will spout or do I sell out prior to what we believe is the inevitable trading halt and delisting, trusting in Geoinvesting's due diligence and track record? The choice is yours and yours alone to make. We have made ours.

Longwei is reportedly engaged in the wholesale distribution of finished petroleum products in the People's Republic of China (the "PRC"). LPH's headquarters are located in Taiyuan, Shanxi Province, adjacent to and overlooking its Taiyuan fuel storage facility. LPH has a reported fuel storage depots of 220,000 metric tons located at three storage facilities within Shanxi: Taiyuan, Gujiao and Huajie, which it claims have individual storage capacities of approximately 50,000 metric tons ("mt"), 70,000mt, and 100,000mt, respectively.

Unfortunately for owners of LPH stock, we have determined that the company's purported business operations are massively overstated and a brazen fraud, on an order of magnitude unmatched before by any China-based companies we have seen. Furthermore, we have no faith in LPH's auditor, Anderson Bradshaw. This is because the firm's head of quality control, Russell Anderson, was the audit partner of YUII while he worked at Child, Van, Wagoner & Bradshaw. Russell failed to detect the massive YUII fraud we uncovered and did not resign until the YUII Chairman admitted fraud 5 days after we exposed them. Our exposé led to YUII's delisting. LPH stock in our opinion is virtually worthless, completely un-investable and should be immediately delisted by the New York Stock Exchange ("NYSE"). We are sending all of our evidence to the NYSE and other securities regulators, just as we have done in prior cases.

**Contents**

**Part I - Wholesale Fuel Sales Are Virtually Nonexistent**

    1. 7 weeks (October 26 to December 13, 2012) of 24/7 time-lapse video surveillance of LPH's Taiyuan and Gujiao fuel storage depots detected only **5 tanker trucks** fueling at the two facilities, **combined**.
    2. In recent press releases and 8-K filings, LPH exaggerated its main Taiyuan and Gujiao facilities' November 2012 sales by a factor of over **800 times**.
    3. In October 2012, prior to conducting our video surveillance, we discovered that the railroad spurs to the Taiyuan and Gujiao fuel facilities were covered with vegetation and appeared unused in some time.
    4. Locals that we interviewed said that LPH's business had been bad for a long time. We were told that the Gujiao facility had been almost completely idled since 2011, when it began losing money on fuel it sold due to unstable fuel prices since 2011.
    5. From December 9 to 22, 2012, we conducted 13 days of 24/7 time-lapse video surveillance of the newly-

opened Huajie fuel storage depot and detected zero tanker trucks being fueled at the facility.
6. CFO Mike Toups, by simply looking out of the Taiyuan office windows at the nearly idled tanker fueling station next door should have easily detected and prevented LPH's brazen fraud given the amount of time he claims to spend at the facility.

**Part II - Legal Issues Abound**

1. LPH never disclosed an investment of $32 million (out of a total commitment of $222 million) in a Tourism business made by its subsidiary Shanxi Zhonghe Energy Conversion Co., Ltd. ("Zhonghe").
2. LPH has eerie ties to Ming Zhao and Puda Coal Group ("PUDA") through its Zhonghe and Huajie facility acquisitions. Investors may remember that Ming Zhao was the mastermind behind the massive PUDA fraud that the GeoTeam uncovered - a fraud which Ming Zhao tried to conceal with a bogus private takeover offer of $12.00 per share while the stock was halted.
3. LPH's minority interests in Taiyuan Longwei, owned by Mr. Cai Yongjun, are not reflected in its balance sheet as non-controlling interests.
4. In its 2011 10-K, LPH claimed that Shanxi Heitan Zhingyou Petrochemical Co., Ltd ("Zhingyou") was an operating subsidiary that **had income tax due** during the financial year ending June 30, 2011. However, in its 2012 10-K, LPH claimed that Zhingyou was a non-operating subsidiary in the financial year ended June 30, 2012 and **did not have** income tax due on June 30, 2011.
5. The disclosed SAT/SAIC file by LPH on June 29, 2012 for the **calendar year 2011** claimed that **only** Taiyuan Longwei Economic & Trade Co., Ltd. generated revenue and paid income tax and VAT tax. This contradicts the annual report (SEC) for the financial year ended on June 30, 2011 during which Zhingyou was still the operating subsidiary for the Gujiao facility.

**Part I - Wholesale Fuel Sales are Virtually Nonexistent**

**1. Seven (7) weeks (October 26 to December 13, 2012) of 24/7 time-lapse video surveillance of LPH's Taiyuan and Gujiao fuel storage depots detected only 5 tanker trucks fueling at the two facilities, combined.**

Seven weeks (October 26 to December 13, 2012) of 24/7 time-lapse video surveillance of LPH's Taiyuan and Gujiao fuel storage depots detected only 5 tanker trucks fueling at the two facilities, combined.

For 49 consecutive days, from October 26 to December 13, 2012, we performed uninterrupted 24/7 time-lapse video surveillance of LPH's Taiyuan and Gujiao fuel storage depots, which together accounted for 96% of LPH's total sales in the last fiscal quarter ended September 30, 2012. What we discovered was shocking. During this entire period we only saw only 5 tanker trucks fueling at the two facilities, combined.

**Taiyuan Facility**

The following satellite overview image of the Taiyuan facility is marked showing the location and field of view of our cameras:



*(click to enlarge)*

As shown in the overview image above, Camera 1 had a clear view of the Retail Gas Station, Tanker Fueling Entrance and a partial view of the Tanker Fueling Station. Camera 2 had a clear view of LPH's corporate Office Entrance adjacent to the Taiyuan facility.

A comparison of our overview image with the following image from page 5 of LPH's October 11, 2012 RedChip PowerPoint presentation confirms that we had our Camera 1 aimed at the Tanker Fueling Station (labeled "Control Center" in LPH's image):